2023 IL App (2d) 210623-U
No. 2-21-0623
Order filed April 14, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF VICKI A. BERNSTEIN, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| and | ) ) | No. 12-D-1550 |
| ROBERT T. BERNSTEIN, | ) ) ) | Honorable Charles W. Smith |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hudson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Because respondent failed to provide us with transcripts from certain hearings on petitioner's counterpetition to modify maintenance, we lack any basis to find that the trial court abused its discretion in finding a substantial change of circumstances justifying a retroactive modification of maintenance. Furthermore, respondent's arguments as to the trial court's imposition of discovery sanctions are forfeited.

¶ 2    Respondent, Robert T. Bernstein, appeals the judgment of the circuit court of Lake County requiring him to pay petitioner, Vicki A. Bernstein, retroactive maintenance in the amount of $73,399.14. Additionally, respondent appeals the court's imposition of sanctions against him as a

result of respondent having surreptitiously obtained a certain financial document from petitioner's garbage. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4       On August 9, 2012, petitioner filed her petition for dissolution of marriage. According to the petition, the parties were married on June 4, 1994, and produced three children during their marriage: (1) H.B., born in December 1996; (2) M.B., born in June 1999; and (3) D.B., born in February 2003. On May 16, 2014, the trial court entered its judgment for dissolution of marriage, which incorporated the parties' marital settlement agreement (agreement) therein.

¶ 5       Pursuant to section 3.1 of the agreement, respondent was required to pay petitioner $2,590 per month in child support "until the emancipation of a minor child," "predicated upon [respondent's] annual base gross salary of $150,000." Section 3.2 of the agreement specified that respondent would also be required to tender child support equaling 32% of "any and all additional [net] income [respondent] receives above and beyond the aforesaid annual base gross salary of $150,000," with an income cap of $350,000. If respondent were to earn more than $350,000 "gross annually," such an increase in income would constitute "a 'substantial change in circumstances' for purposes of filing a [p]etition for [m]odification with the court." Another section of the agreement—which, as a result of what we presume to be a scrivener's error, was also labeled as section 3.2—specified certain events upon which the minor children would be deemed to be emancipated. One of these events included a minor child "attaining the age of eighteen (18) years or completion of a high school education, whichever later occurs, but in no event beyond the child's nineteenth (19th) birthday."

¶ 6       Section 7.2 of the agreement established that, "commencing June 1, 2014[,] and continuing on the first day of each month thereafter for a period of seventy-five (75) months, [respondent]

shall pay non-reviewable as to duration maintenance to [petitioner], the sum of One Thousand Seven Hundred and Fifty ($1,750) Dollars per month" until the occurrence of certain triggering events. Pursuant to the agreement, these maintenance payments would end in August 2020. Section 7.2 of the agreement further provided that:

"In the event [respondent] receives additional income (as defined in [section] 3.2) in excess of his base annual gross salary of $150,000 up to a total of $350,000 gross annually, [respondent] shall pay to [petitioner] twenty (20%) percent of the gross additional income minus the additional properly calculated child support paid pursuant to [section] 3.2 within fourteen (14) days of the receipt of the same[.] If [respondent] earns more than $350,000 gross annually, this will be considered a 'substantial change in circumstances' for purposes of filing a Petition for Modification with the court."

Finally, section 17.3 of the agreement, entitled "Non-Modifiable," stated, "The terms and provisions of this Agreement, unless otherwise provided to the contrary herein, which do not pertain to the children or maintenance, shall not be modified in any way by any court at any future date."

¶ 7    On May 26, 2015, respondent filed his petition to modify child support based on H.B.'s upcoming emancipation and "recent revisions" to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.*) (West 2014)). On November 25, 2015, the trial court entered an order modifying respondent's child support obligation to a negotiated $2266 a month.

¶ 8    On January 19, 2017, respondent filed his petition to modify and abate child support, arguing that, as a result of his recent unemployment, a substantial change in circumstances had occurred requiring modification or abatement of his child support obligations. On October 2, 2017, respondent amended his petition to modify and abate child support. The amended petition reflected

that, since filing his January 19, 2017, petition, respondent became employed once again, and, as of June 2017, M.B. had become emancipated. Due to these substantial changes in circumstances, as characterized by respondent, respondent sought a court order "resetting [respondent's] obligation of child support for the parties' one (1) remaining minor child," D.B.

¶ 9    On October 6, 2017, petitioner filed her answer to respondent's amended petition, which incorporated her counterpetition for modification of maintenance. In the counterpetition, petitioner argued that, due to the formula the parties used to reach respondent's maintenance obligations, the trial court could not "modify child support without also mandating a modification of maintenance." More specifically, petitioner's counterpetition alleged that, under the agreement, respondent's maintenance obligations were "set at 20% of [respondent's] gross pay, *after child support was reduced from* [*respondent's*] *gross pay*." (Emphasis in original.) Therefore, in recognition of recent statutory changes to the Act "wherein maintenance is an allowable deduction for purposes of setting the amount of child support the obligor should pay," petitioner argued that, "if the court merely calculate[d] child support[] without changing the maintenance calculations," respondent would effectively receive "two deductions, one for maintenance from the child support and one for child support from the maintenance."

¶ 10    On November 3, 2017, respondent filed his motion to dismiss petitioner's counterpetition for modification of maintenance, arguing that, pursuant to section 7.2 of the agreement, "the amount of [respondent's] payment of maintenance was *only* subject to modification if [respondent] earned more than $350,000.00 gross annually." (Emphasis in original.) Consequently, because, "[o]n no occasion since the entry of Judgment has [respondent] earned in excess of $350,000.00 gross annually," respondent argued that petitioner's counterpetition should be

dismissed with prejudice. On December 5, 2017, the trial court denied respondent's motion to dismiss.

¶ 11    On June 18, 2018, the trial court set an August 6, 2018, hearing date for the parties' "pending pleadings," which included respondent's amended petition to modify and abate child support and petitioner's counterpetition to modify maintenance. We note that respondent did not include transcripts of the August 6, 2018, hearing in the record. Pursuant to an October 22, 2018, order, the matter was set for continued hearing on the parties' pending petitions on December 13, 2018. Again, no transcripts from the December 13, 2018, hearing appear within the record. On January 29, 2019, the trial court once again ordered a continued hearing as to the parties' pending petitions, to take place on March 4, 2019. No transcripts from the March 4, 2019, hearing appear within the record. On that date, however, the trial court entered an order specifying that it had "conclud[ed] testimony" in the parties' "continued trial" before ordering the parties to complete written closing arguments. The matter was set for "oral rebuttal argument" on April 25, 2019.

¶ 12    Only respondent's written closing arguments—which were filed on March 29, 2019—appear within the record. In his closing arguments, respondent argued—among other things—that the evidence adduced during the prior hearings was in no way "relative to [petitioner's] constant financial condition and an increased need for maintenance since the entry of judgment." Respondent then discussed petitioner's testimony from the prior hearings, in which she purportedly confirmed the "plethora of financial resources she ha[d] at present." For instance, according to respondent, petitioner had testified as to her earnings and financial assistance that she had received from her "wealthy parents" and "long-term boyfriend," which rebutted any finding that maintenance should be modified in petitioner's favor.

¶ 13     On April 25, 2019, the trial court entered an order reflecting that rebuttal arguments as to the parties' pending petitions had been presented that day. No transcripts of the April 25, 2019, rebuttal arguments appear within the record.

¶ 14     On May 28, 2019, the trial court entered an order requiring the parties to provide "additional argument and authority on child support modification," and continued the matter for additional ruling on May 31, 2019. On May 30, 2019, petitioner filed her memorandum in support of her closing argument. On that date, respondent also filed his own memorandum.

¶ 15     On May 31, 2019, the parties appeared for ruling as to respondent's amended petition to modify and abate child support and petitioner's counterpetition to modify maintenance. The trial court made certain findings as to the petitions and first "reject[ed respondent's] position that *** maintenance is non-modifiable as to amount," instead finding that the "explicit terms of the" parties' agreement were "only non-modifiable as to duration." The court further found that M.B.'s recent emancipation "was a foreseeable event," suggesting that the emancipation did not constitute a substantial change in circumstances. "However," according to the court, "neither party could have anticipated the changes in child support, [m]aintenance [s]tatutes [*sic*] that have taken place since their divorce."

¶ 16     Specifically concerning maintenance, the court found that there was "a change in circumstances as allowed by *** [s]tatute to support a modification." While the court clarified that no recent amendments to the Act could, standing alone, constitute a substantial change in circumstances, it nonetheless noted that the parties' agreed-upon formula for calculating maintenance was dependent upon respondent's child support obligations, and that recent amendments to the Act therefore triggered "a rather dramatic change" in the amount of maintenance petitioner would be entitled to. Regardless, "aside from the statutory modification,"

the court noted petitioner's "increased expenses for caring for [the] children," "the lack of employment by [petitioner], and the expenses consisting of college-age children," which all constituted "substantial changes in [petitioner's] circumstances warranting the modification of maintenance." The court emphasized that its finding of a substantial change in circumstances was "based on [these] changes and not solely on the modifications in the [s]tatutes."

¶ 17    Having found a substantial change in circumstances that warranted a recalculation of maintenance, the court outlined certain findings that it had made during its earlier hearings as they pertained to section 510(a-5) of the Act (750 ILCS 5/510(a-5) (West 2018)). However, the court did not issue any final judgment as to maintenance, but instead set another hearing to obtain more information concerning any imputed income petitioner may have received from her father, Raymond Allen, for purposes of calculating respondent's new maintenance obligations.

¶ 18    Concerning respondent's arguments as to his sought-after modification or abatement of child support, the court found that respondent was "entitled to retroactive modification of child support to the date of his amended [petition]," with his new child support obligation to be calculated "under income shares" as provided by recent amendments to the Act. Pertinent to that calculation, the court determined that respondent's income was $275,000, "as was testified to at the [prior] hearing." Again, however, the court reserved any final ruling as to respondent's new obligations until it heard evidence concerning petitioner's imputed income.

¶ 19    On June 12, 2019, respondent issued his first discovery request for production of documents to petitioner. Among other things, the respondent sought the turnover of any "[c]opies of statements for all credit cards in [p]etitioner's name for the period [of] October 1, 2017[,] to the present." Petitioner moved to quash the request, arguing that the "proofs in this matter closed."

Additionally, petitioner argued that respondent requested the documents for the sole purpose "to harass [petitioner] and cause undo [*sic*] anxiety and stress to the [p]etitioner."

¶ 20     On June 26, 2019, respondent issued a subpoena to Capital One, LLC, seeking account statements for petitioner since October 1, 2017. On July 1, 2019, petitioner filed a motion to quash the subpoena, again arguing that the proofs had already closed, and that the subpoena was designed to harass petitioner. On August 5, 2019, the court denied both of petitioner's motions and further ordered that any documents Capital One, LLC produced pursuant to respondent's subpoena would be tendered to petitioner and the court for in-camera review and redaction of irrelevant charges. While ordering petitioner to identify any pertinent charges within the Capital One documents, respondent's counsel, Michael A. Weiman, informed the court, "We're under the impression, Judge, that the statements break it out." Petitioner inquired as to how respondent "would be under the impression of what [the] statement[s] look[] like" if he had not previously seen them, and the court opined that respondent may have just made "a real good guess on his part." Weiman remained silent. On September 23, 2019, petitioner tendered the redacted Capital One, LLC statements to respondent, which she represented were "for a credit card in the name of her father," Allen.

¶ 21     On June 3, 2020, petitioner filed her motion to sanction respondent and his counsel pursuant to Illinois Supreme Court Rule 219(d) (eff. July 1, 2002). According to the motion, "on June 26, 2019, *** [r]espondent, through [c]ounsel[,] issued a [s]ubpoena to Capital One, LLC[,] seeking copies of [Allen's] credit card statements for the period of October 1, 2017[,] to present." Petitioner further argued that, subsequent to the issuance of the subpoena, on July 29, 2019,[1] the

---

[1]The motion for sanctions listed July 29, 2020, as the date of the settlement conference,

parties participated in a settlement conference, during which Weiman "questioned [petitioner] on specific charges on her father's credit card statement." In turn, petitioner had questioned Weiman as to how he and respondent "would know what charges were on her father's credit card statement." Weiman purportedly "warned [petitioner] 'to be careful[,]' but at no time did he disclose that he was in fact in possession of [Allen's] credit card statements." Petitioner further argued that, during the August 5, 2019, hearing on petitioner's July 1, 2019, motion to quash the subpoena to Capital One, LLC, Weiman failed to inform the court that respondent already possessed the statements that he had sought from Capital One, LLC, which contained confidential information concerning Allen. In support of this argument, petitioner referenced Weiman's earlier statements from the motion to quash, in which he suggested he was familiar with the statements' contents.

¶ 22    The motion further argued that, subsequent to the hearing on petitioner's motion to quash, Allen had filed a complaint with the Attorney Registration and Disciplinary Commission (ARDC), alleging that "his Capital One credit card statements were obtained by [respondent] and his [c]ounsel improperly and not via any lawful subpoena." In his response to the complaint, Weiman had purportedly "admitted that[,] in June 2019, [respondent] tendered him monthly statements for the Capital One credit card belonging to [petitioner's] father." Petitioner alleged that, despite respondent therefore already having the credit card statements at issue, "[c]ounsel for [respondent] issued a subpoena to Capital One." Based on these allegations, petitioner argued that "[respondent] and his [c]ounsel abused the discovery process, misled th[e] [c]ourt and intentionally used the

_____

but, given the fact that the motion was filed prior to this date, we presume the conference occurred in 2019.

subpoena to Capital One to harass [petitioner] and increase her attorney's fees to obtain lawfully subpoenaed credit card statements of a non-party[,] which they already had in their possession unlawfully." Petitioner asserted that respondent's conduct was violative of Rule 219(d) and warranted sanctions.

¶ 23    On July 7, 2020, respondent responded to the motion for sanctions. In his response, respondent denied "the blatantly false" allegation that he had issued any subpoena seeking petitioner's "father's credit card statements," instead explaining that he had only sought "statements for an account in [petitioner's] name." Respondent further denied that he was in possession of "the credit card statements at issue on July 29, 2019." Respondent additionally disputed petitioner's earlier allegations that, at the August 5, 2019, hearing on petitioner's motion to quash, Weiman had failed to inform the court that respondent already had possession of the sought-after Capital One statements, asserting that petitioner should be sanctioned for "making and advancing *** false and defamatory claims." However, respondent asserted that "he procured an individual, partial statement for the Capital One credit card account at issue in a proper fashion."

¶ 24    On July 16, 2020, the court began its hearing on petitioner's motion for sanctions. Allen was first called as a witness, and he testified that he was petitioner's father, and that he received monthly credit card statements from Capital One, which were sent to his home in Boca Raton, Florida. He had never given any of the statements to respondent or his counsel, and he had never authorized Capital One to deliver his statements to respondent. After coming to believe that respondent had nonetheless come to possess his credit card statements, Allen filed a complaint with the ARDC, alleging that Weiman had "stolen" or "somehow hacked" him in order to obtain the credit card statements. Allen had also contacted Capital One concerning the matter, and the bank denied that it had ever tendered any statements to any third parties.

¶ 25    Allen testified that he never sent any of the subject credit card statements to petitioner. When asked how petitioner may have come to obtain one of the credit card statements, Allen reiterated that he did not send the statement to her. Weiman began to question Allen about a series of charges that petitioner had purportedly made with Allen's credit card, prompting an objection on the basis of relevance. Weiman suggested that petitioner was an authorized user of Allen's card, and that, as a result, she was able to obtain copies of the credit card's statements. Allen confirmed that petitioner was an authorized user for his credit card, but denied having any knowledge as to how petitioner would have gotten the statements.

¶ 26    Petitioner was called as a witness and testified that, on September 26, 2019, she had provided respondent with redacted copies of Allen's credit card statements, but prior to that, she had not shared the statements with any party. Petitioner denied receiving copies of credit card statements by any means.

¶ 27    Once petitioner saw that respondent had subpoenaed Capital One, LLC, she began to suspect that he and Weiman had "a copy of the statements." Petitioner's suspicions had further been aroused when, at the parties' August 5, 2019, hearing date, Weiman had described "what the statements look[ed] like."[2] Petitioner also testified that she became more suspicious once Weiman was able to identify a charge that appeared on the statement at a hearing taking place in the latter half of July 2019.

¶ 28    Petitioner testified that Weiman had threatened her concerning the contents of the credit card statements, in that, during a settlement negotiation, the topic of the statements had come up

---

[2]Petitioner inaccurately testified that the date of the relevant hearing was in June or July of 2019.

when Weiman told her she "better be very careful in what [she] say[s]," because respondent "[was] out for blood and that he [was] like a dog looking for a bone." Petitioner testified that, as a result of the "Capital One issue," she incurred approximately $7600 in legal fees.

¶ 29    On cross-examination, respondent directed petitioner to examine the rider of his June 26, 2019, subpoena to Capital One. Petitioner acknowledged that the rider only sought account statements "in the name of Petitioner." Respondent then asked whether petitioner's motion for sanctions—which alleged that respondent and his counsel sought to subpoena Capital One, LLC, to obtain copies of Allen's credit card statements—contained "a false statement." Petitioner responded, "Well, it is his credit card statement. It is not my credit card."  However, petitioner eventually acknowledged that the subpoena "just reference[d] credit card statements in [her] name," and not Allen's. Still, petitioner maintained that, regardless of the name issued on the subpoena, respondent essentially issued a subpoena for Allen's records, as the sought-after statements pertained to his credit card.

¶ 30    Respondent questioned petitioner as to whether she retained any physical copies of the relevant credit card statements in her home during the first seven months of 2019. Petitioner could not recall. Respondent then asked, "Isn't it true, ma'am that—bear with me, Judge—that on Monday, June 17, 2019, you placed a portion of a statement for one of those Capital One credit card statements in your garbage?" Petitioner responded, "Are you telling me [respondent] went through my garbage?" Eventually petitioner responded that she could not recall whether she placed the portion of the statement in her garbage.

¶ 31    After petitioner testified, the parties argued whether Weiman should be called as a witness for any sanctions proceedings. During those arguments, the court asked Weiman whether he would stipulate that he was in possession of Allen's credit card statement prior to issuing the subpoena

to Capital One. Eventually, Weiman responded, "Not an entire one. A portion of one." "[U]nder the preface that there was no outstanding discovery at the time," Weiman additionally stipulated that he had not tendered that partial statement to petitioner. Having been satisfied with Weiman's stipulations, the court found there would be no reason for Weiman to testify in the sanctions proceedings.

¶ 32    Respondent was next called to testify. He testified that he had possessed a partial copy of Allen's credit card statement prior to issuing a subpoena to Capital One. He admitted that he "got it from [petitioner's] garbage" on June 17, 2019. When asked why he was going through petitioner's garbage, respondent offered, "Because I had been advised by the judge who had said that there was an issue with regard to [petitioner's] income from all sources." Respondent continued, explaining that petitioner and her counsel had not been forthcoming with petitioner's employment information, prompting an objection from petitioner. The court overruled the objection but rejected respondent's "insinuation" that it had "told him to go through [petitioner's] garbage."

¶ 33    Respondent next described how, on June 17, 2019, he had gone to "the public streetside where [petitioner's] garbage is picked up," retrieved petitioner's garbage bags, put them in his vehicle, and "took them home." He had not asked petitioner beforehand whether he could "go through her garbage" or "take any of her garbage." When asked whether respondent had otherwise received such permission from the Village of Highland Park, respondent responded, "From the police. I'm not sure if that's the same thing." Respondent elaborated:

"I—I called the police and I spoke with a sergeant who—to confirm that the case law that I read was correct and see if there were any local laws or ordinances. And he said it's perfectly legal to take trash once it's left at the streetside."

However, respondent had no "written documentation" verifying that he had spoken with the Highland Park police prior to taking petitioner's garbage, and he could not recall the name of the sergeant he had spoken with.

¶ 34 Petitioner asked respondent whether he was aware that his conduct was violative of a Highland Park village ordinance. He was not. Respondent identified seven different documents that he had obtained from petitioner's garbage can. Three documents—a partial Capital One, LLC statement, a credit card statement, and a promissory note—were all obtained in June 2019. Respondent recovered other financial documents from petitioner's garbage—which are not at issue here—in July, August, and October of 2019. He suspected that the credit card described in the aforementioned partial statement belonged to petitioner's father.

¶ 35 Following respondent's testimony, the trial court took judicial notice of Highland Park Municipal Code Ordinance § 96.103 (eff. Apr. 11, 2011), which prohibited persons from removing any other parties' refuse that had been left out for curbside pickup.

¶ 36 After hearing further arguments from the parties, the court stated that it was "a little disingenuous" for respondent to omit informing the court that he already had portions of petitioner's subject credit card statement while arguing against petitioner's motion to quash. Respondent asserted that, while he had not informed the trial court or the petitioner that he had already obtained part of the statement, he justified the omission based on purported advice from the court that he had no obligation to disclose this information. The court disputed respondent's recollection of the hearing, and further suggested that, whatever the circumstances, respondent should have been forthcoming about the statement he had already obtained. The court advised the parties that it would take the matter under advisement.

¶ 37    On November 19, 2020, the parties appeared for ruling on petitioner's motions for sanctions and to quash "subpoenas and the evidence obtained by way of removal of documents from [petitioner's] garbage."[3] Concerning the motion to quash, the court advised the parties that it had found that, by removing documents from petitioner's garbage, respondent had violated the Highland Park ordinance. As such, the court informed the parties that it would "follow the analysis as [it] would in a criminal case of the fruits of the poisonous tree." Specifically, the court noted that, normally, "[i]f a police officer obtains evidence in violation of somebody's Fourth Amendment rights, all evidence that was obtained as a result of anything flowing therefrom is subject to suppression." Analogously, the court would follow a similar logic here and would therefore bar any evidence obtained as a result of respondent violating the Highland Park ordinance. However, respondent was still entitled to present evidence concerning any other imputed income petitioner may have had from other sources.

¶ 38    Concerning sanctions, the court noted that the underlying "litigation has unfortunately been unnecessarily contentious, vindictive, vitriolic, and downright disgusting." The court specifically found respondent's retrieval of the partial credit card statement to be "tantamount to stalking," and noted that "lurking outside of [one's] ex-spouse's home and to be delving into her dumpster to go through whatever she may have put out is not what the Illinois Code of Civil Procedure suggests

---

[3]As mentioned above, on August 5, 2019, the trial court entered an order denying petitioner's motion to quash the subpoenas issued to Capital One, LLC; we are unable to find any other motions to quash concerning the subpoena or any evidence obtained from petitioner's garbage in the record provided to us.

is the appropriate method for conducting discovery." The court also expressed feeling misled while the parties argued over petitioner's motion to quash the Capital One subpoena, telling the parties:

"I was not told by counsel that the information I have, I really already have the records because my client went into his ex-wife's dumpster to get them. And that I consider to be unfortunate that it was not dealt with fairly in being told how the information was retained—obtained."

Ultimately, the court stated that it would allow petitioner to file a new motion for sanctions, in which she could itemize her costs incurred as a result of respondent's and Weiman's actions. On November 23, 2020, the court filed an order memorializing these findings.

¶ 39   On December 14, 2020, petitioner filed her updated motion for sanctions, which alleged that she had incurred $14,667.25 in attorneys' fees stemming from respondent's "willful refusal to comply with written discovery," *i.e.*, the improper retention of the partial Capital One, LLC credit card statement and the proceedings resulting therefrom.

¶ 40   On December 18, 2020, respondent filed a motion to reconsider, requesting that the court reconsider and vacate its findings as to sanctions. Respondent argued that he had acted properly in obtaining the partial Capital One credit card statement from petitioner's garbage, that the garbage was not subject to Fourth Amendment protections, and that "[n]o precedent exists for the proposition that [respondent's] lawful review of *** [p]etitioner's garbage and his acquisition of information which she abandoned, which was placed into the public domain, and which directly relates to the issues pending before the court constitutes sanctionable conduct." On May 11, 2021, the court denied respondent's motion to reconsider "[f]or the reasons set forth on the record."

¶ 41   On May 28, 2021, the parties appeared for a hearing to determine "the monetary amount of the sanction against [respondent]." As summarized by the trial court, petitioner now argued that

respondent should be sanctioned in the amount of $16,107.25, while respondent argued that, if he were sanctioned at all, the amount of the sanction should not exceed $2310. After hearing the parties' brief arguments, the court took the matter under advisement.

¶ 42    On June 30, 2021, the trial court issued its written determination of respondent's monetary sanction. The court first reiterated its earlier findings that respondent had violated applicable discovery rules by "watching his ex-wife's home and going through her garbage to retrieve [a] credit card statement," and by Weiman's lack of candor to the court when subsequently seeking the relevant subpoena for the same. The court ultimately sanctioned respondent in the amount of $10,392.25 to be paid to petitioner's counsel, with an additional $500 sanction that was to be paid to the county's Veteran's Court, to "discourage [respondent's] conduct in the future."

¶ 43    On July 14, 2021, respondent filed his motion for the court to reconsider its June 30, 2021, ruling. On July 16, 2021, petitioner filed her motion to enforce the trial court's June 30, 2021, order, which respondent had not timely complied with.

¶ 44    On July 30, 2021, petitioner filed two motions *in limine*. The first motion included a reminder to the court that, pursuant to its May 2019, order, "[t]he matter is set for a brief hearing based on the limited issues of" petitioner's alleged, imputed income. Thus, petitioner sought an order limiting the parties' testimonies and evidence to this sole issue. However, given the long amount of time that had lapsed since its earlier finding of a substantial change in circumstances, petitioner also stated that she was "amenable" to the parties offering "updated incomes from employment through May 2021" during the hearing.

¶ 45    On September 2, 2021, the parties appeared for ruling as to petitioner's motion to enforce, respondent's motion to reconsider, respondent's amended petition to modify child support, and petitioner's counterpetition to modify maintenance. Concerning the motions to enforce and to

reconsider, the court reiterated that respondent's conduct in going through petitioner's garbage was "not an appropriate way to conduct discovery under the Illinois Code of Civil Procedure." Therefore, the court sanctioned respondent for this perceived discovery violation, and it denied respondent's motion to reconsider. The court granted petitioner's motion to enforce, further ordering respondent to comply with its earlier, June 30, 2021, sanctions order within seven days.

¶ 46   After the trial court made its rulings as to respondent's motion to reconsider and petitioner's motion to enforce, the matter moved to a hearing on the pending support and maintenance issues. Petitioner testified and updated her income.

¶ 47   On cross-examination, respondent asked petitioner whether it was true that respondent had paid her maintenance in accordance with the parties' marital settlement agreement in the months between October 2017 and August 2020. Petitioner responded in the negative, later clarifying that respondent paid her "a fixed amount of maintenance *** that was based upon the old statute, but [he] was not paying [her] the correct amount of child support."

¶ 48   Respondent testified as to his income. He acknowledged that, since maintenance terminated in August 2020, he had unilaterally calculated the amount of child support he was to pay for D.B., without giving petitioner his "calculation" for doing so.

¶ 49   On September 3, 2021, the court entered a written order denying respondent's motion to reconsider, granting petitioner's motion to enforce, and ordering the parties to submit closing arguments. On September 24, 2021, respondent filed his closing arguments, which, among other things, generally attacked the trial court's May 31, 2019, findings of a substantial change in circumstances warranting a modification of maintenance. Petitioner's closing arguments are not present within the record.

¶ 50     On October 18, 2021, the parties appeared for ruling as to respondent's amended petition to modify child support and petitioner's counterpetition to modify maintenance. The court explained that, in his written closing arguments, respondent had "asked [the c]ourt to reverse its prior rulings," presumably referring to the May 31, 2019, order finding a substantial change in circumstances warranting a modification of maintenance. The court stated that it "decline[d] [respondent's] request" to reverse the order. To this point, despite having ruled on May 31, 2019, that there had been a substantial change in circumstances warranting a modification of maintenance irrespective of any amendments to the Act, the court now characterized its prior decision as resolving the question of "whether the legislature's change in child support statute which parenthetically drastically reduces the payor's obligation constitutes a substantial change in circumstances such as to allow the payee, in this case [petitioner], to see a modification of maintenance, also amended by the legislature."

¶ 51     Concerning the issue of child support, the court now noted that the Act's amendments were unforeseeable at the time of the parties' divorce and reasoned that respondent's resulting reduction in child support obligations warranted a modification of maintenance. Accordingly, the court granted petitioner's counterpetition to modify maintenance, awarding her "maintenance in arrearage of $73,399.14." Concerning respondent's amended motion to modify child support, the court found that respondent had already improperly and "unilaterally changed the amount of support based upon his, not the Court's calculation of child support." Because this was not the "proper procedure" that respondent should have followed, the court also awarded petitioner "child support arrearage of $1,764.41," presumably because D.B., the parties' youngest child, had already been emancipated by the terms of the agreement. On October 19, 2021, the court entered an order memorializing these findings. Respondent timely appeals.

¶ 52                                  II. ANALYSIS

¶ 53     On appeal, respondent argues that: (1) the trial court misapplied the law in retroactively modifying maintenance, resulting in an abuse of discretion; (2) the court abused its discretion in imposing Rule 219(d) sanctions against respondent; and (3) that the court's decision to prohibit respondent "from using as exhibits, or testifying at any hearing, or using any documents or records he obtained as a result of his ordinance violations" was not based upon "reasonable criteria."

¶ 54                  A. Compliance With Illinois Supreme Court Rules

¶ 55     Before we may analyze respondent's arguments, however, we must first address petitioner's various arguments that, as a result of respondent's "sufficiently egregious" violations of our supreme court's rules, we should strike respondent's briefs, dismiss the instant appeal, or, alternatively, affirm the trial court's orders. Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020) governs the contents of appellants' briefs. "The rules of procedure concerning appellate briefs are rules and not mere suggestions." *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). This court has the authority to strike a brief that lacks substantial conformity to our supreme court rules. *Id.* Still, striking a brief is a harsh sanction that is only appropriate where violations of procedural rules hinder our review. *Hall v. Naper Gold Hospitality LLC,* 2012 IL App (2d) 111151, ¶ 15. Here, petitioner argues that respondent's compliance with our supreme court's rules was fatally defective in three respects: (1) because respondent failed to attach an appendix to his opening brief; (2) because respondent failed to furnish us with a complete record; and (3) because respondent failed to support his various arguments with sufficient citations to the record. While we do not find that any one of these alleged violations in and of itself requires us to strike the entirety of respondent's briefs and dismiss the instant appeal, we do find that respondent's cumulative failures to furnish us with a complete record and to support certain of his arguments with citations to the record leave

us with no basis to find that the trial court erred in retroactively modifying maintenance or in issuing Rule 219(d) sanctions, respectively.

¶ 56                                    1. Incomplete Record

¶ 57    First, because respondent has not provided us with a sufficiently complete record of proceedings underlying the trial court's findings of a substantial change in circumstances, we are without basis to find that the court abused its discretion in retroactively modifying maintenance. Pursuant to Illinois Supreme Court Rule 321 (eff. Oct. 1, 2021):

> "The record on appeal shall consist of the judgment appealed from, the notice of appeal, and the entire original common law record, unless the parties stipulate for, or the trial court, after notice and hearing, or the reviewing court, orders less. *** The record on appeal shall also include any report of proceedings prepared in accordance with Rule 323."

Pursuant to Illinois Supreme Court Rule 323 (eff. July 1, 2017), "The report of proceedings shall include all the evidence pertinent to the issues on appeal."

¶ 58    It is well established that it is the appellant's burden to "present a sufficiently complete record of the trial proceedings to establish the claimed error and that[,] in the absence of an adequate record on appeal, it is presumed that the order entered conforms to the law and is based upon a sufficient factual basis." *Chicago City Bank & Trust Co. v. Wilson*, 86 Ill. App. 3d 452, 454 (1980). "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 59    Here, petitioner argues that respondent has failed to furnish us with a sufficient report of proceedings to adequately analyze whether the trial court erred in retroactively modifying maintenance. Specifically, petitioner points out that respondent failed to attach transcripts of the hearings that took place on August 6, 2018, December 13, 2018, and March 4, 2019. Because the

record indicates that the evidence and testimony adduced in these hearings formed the basis of the trial court's May 31, 2019, findings that a substantial change in circumstances occurred, thus supporting a modification of maintenance, petitioner reasons that respondent has deprived us of an adequate record to review the trial court's decision. Consequently, petitioner argues that we must affirm the trial court's modification of maintenance under *Foutch*.

¶ 60 Petitioner additionally argues that respondent failed to provide us with certain of her written closing arguments on the subject of modification, "a transcript or suitable substitute of the parties' oral rebuttal arguments that took place on April 24, 2019, and all of the exhibits entered throughout the various hearings." Petitioner asserts that these omissions further preclude us from adequately reviewing the court's modification of maintenance, while simultaneously prejudicing petitioner's "ability to effectively respond to the appeal."

¶ 61 In response, respondent argues that his brief "presented clear and orderly arguments supported by detailed and specific recitations to the common law record and the report of proceedings" to support his claim that "the trial court erred in finding that a substantial change in circumstances had occurred post-judgment to warrant the granting of [petitioner's] Counter-Petition for Modification of Maintenance." Respondent further points out that petitioner "took no action to supplement the record by way of a bystanders report from the hearing dates in 2018 and 2019," seemingly reasoning that it was petitioner's burden to provide us with a sufficient record. Respondent also argues that the August 6, 2018, December 13, 2018, and March 4, 2019, hearings had "no direct correlation to the matters on appeal." Instead, respondent suggests that only the September 2, 2021, hearing date, which he has included within the record, was pertinent to the maintenance issues he raises on appeal.

¶ 62    We disagree. Here, respondent argues: (1) that the court improperly found that a reduction in child support upon a child's emancipation constitutes a substantial change in circumstances for purposes of maintenance; (2) that the court improperly found that certain, recent amendments to the Act constituted a substantial change in circumstances for purposes of maintenance; (3) that, pursuant to the agreement, no substantial change in circumstances could have occurred unless respondent was earning at least $350,000 "gross annually;" and (4) that the record rebutted any finding that petitioner's financial circumstances substantially changed so as to warrant a modification of maintenance. Clearly, all of these arguments directly relate to the sole question of whether a substantial change in circumstances had indeed occurred.

¶ 63    To this point, numerous portions of the available record make it abundantly clear that the August 6, 2018, December 13, 2018, and March 4, 2019, hearings—which are all missing from the record—provided the foundation for the court's May 31, 2019, findings of a substantial change in circumstances. First, the trial court's orders from June 18, 2018, October 22, 2018, and January 29, 2019, all reference continued hearings as to all of the parties' pending petitions, which took place on August 6, 2018, December 13, 2018, and March 4, 2019, respectively. Because petitioner's counterpetition to modify maintenance was pending at this time, we presume that these hearings included argument and evidence as to the counterpetition. Again, any transcripts from these hearing dates are noticeably absent from the record.

¶ 64    Second, respondent's March 29, 2019, closing arguments reference petitioner's counterpetition and acknowledge that, during prior hearings, evidence and testimony was adduced regarding the parties' finances, which, again, would have been directly relevant to any findings of a substantial change in circumstances. Given the June 18, 2018, October 22, 2018, and January 29, 2019, orders, we presume the prior hearings alluded to in respondent's closing arguments included

the August 6, 2018, December 13, 2018, and March 4, 2019, hearing dates, which are not contained within in the record. Even if this were not the case, we note that the earliest hearing date included in the instant report of proceedings is from July 16, 2020. Accordingly, none of the hearings referenced in respondent's March 29, 2019, closing argument are located within the record.

¶ 65    Third, during its May 31, 2019, ruling, after the August 6, 2018, December 13, 2018, and March 4, 2019, hearings had already taken place, the court unambiguously found a substantial change in circumstances. A partial hearing transcript from May 31, 2019, which is attached to one of petitioner's July 30, 2021, motions in *limine*, also references a prior hearing in which evidence as to the counterpetition for modification of maintenance was adduced. No such hearing transcript outlining this evidence is included within the record.

¶ 66    Fourth, respondent's September 24, 2021, written closing arguments further provide that "[t]he court commenced hearing on [petitioner's] Counter-Petition for Modification of Maintenance and [respondent's] Amended Petition to Modify Child Support on August 6, 2018," and that, following "[four] afternoons of hearing," which presumably included the other hearing dates that are absent from the record, the court issued its May 31, 2019, finding of a substantial change in circumstances.

¶ 67    From all of these portions of the available record, it is obvious to us that the August 6, 2018, December 13, 2018, and March 4, 2019, hearings all involved testimony and other evidence that the court relied upon in making its May 31, 2019, finding of a substantial change in circumstances, which respondent now disputes. Accordingly, because respondent has failed to provide us with any transcripts of any of these relevant hearings, we cannot determine what evidence or arguments the court was presented with in order to determine whether its finding of a

substantial change in circumstances was an abuse of discretion. *Foutch*, 99 Ill. 2d at 392.[4] While respondent suggests that it was petitioner who failed to adequately supplement the record through use of bystanders reports, Illinois law is clear that, as appellant, it was solely his burden to furnish us with an adequately complete record. *Chicago City Bank & Trust Co*, 86 Ill. App. 3d at 454.

¶ 68    Even more, we note that portions of the incomplete record that we have been provided with plainly cut against certain of respondent's claims. For instance, while respondent repeatedly bemoans the trial court's order for improperly finding that "the Illinois legislature['s] changes in

---

[4]Arguably, because the parties' agreement *is* contained within the record, we are enabled to review respondent's argument that the agreement operated to preclude any maintenance modifications whatsoever unless respondent earned at least $350,000 a year in gross income. Either way, a cursory glance over the agreement belies respondent's argument. Parties undergoing a dissolution of marriage "may agree that maintenance shall not be modified or terminated except upon certain specified conditions." *In re Marriage of Schweitzer*, 289 Ill. App. 3d 425, 428 (1997). However, "[t]he intent of the parties to preclude or limit modification of maintenance must be clearly manifested in their agreement." *Id*. Here, respondent reasons that, because the agreement only specified there would be a substantial change in circumstances warranting a modification of maintenance if respondent's gross income exceeded $350,000, no other circumstances could constitute a substantial change in circumstances. However, there is no language in the agreement whatsoever that clearly specifies that maintenance is nonmodifiable. To the contrary, section 17.3 of the agreement only specifies that the "terms and provisions" of the Agreement "which do not pertain to the children or maintenance *** shall not be modifiable in any way by any court at any future date."

the child support statute alone constitutes [*sic*] a substantial change in circumstances," the partial transcript from the court's May 31, 2019, ruling demonstrates that the trial court found a substantial change in circumstances irrespective of any amendments to the Act. Specifically, the court *did* note that neither party could have anticipated the recent amendments to the Act, but also found that any changes to the Act "alone cannot be grounds for a change under [section] 510(a)(5) of the [Act]." After briefly discussing petitioner's finances, the court then went on to "find that there is a reduction warranted by a change in circumstances *aside from the statutory modification*," namely, "[t]he increased expenses for caring for children, one who is now in his mid-teens, the youngest, [D.B.], the lack of employment by [petitioner] and the expenses consisting of college-age children, hopefully, going to school, [and] providing a home during the school year." (Emphasis added.) This portion of the partial May 31, 2019, transcript also cuts against respondent's self-contradicting argument that the court improperly relied upon M.B.'s emancipation in finding a substantial change in circumstances.[5] While the trial court confusingly contradicted some of these findings in its October 18, 2021, comments, the fact remains that, at the time the court found there to be a substantial change in circumstances on May 31, 2019, its ruling was expressly based on circumstances independent from the amendments to the Act.

¶ 69    Furthermore, respondent's suggestion that the September 2, 2021, hearing transcript sufficiently allows us to review the maintenance issue distorts the record. Again, here, all of respondent's arguments as to the trial court's modification of maintenance directly involve the

---

[5]Even more damning, at the May 31, 2019, hearing, the court actually found that M.B.'s emancipation was a "foreseeable event," suggesting that the emancipation did not constitute a substantial change in circumstances.

specific issue of whether a substantial change in circumstances had occurred to warrant modification. As we have mentioned several times now, the court here determined on May 31, 2019, that such a change had occurred. Respondent himself acknowledged this fact in his September 24, 2021, written closing arguments. Pursuant to the trial court's orders, any future hearings as to maintenance were solely limited to the issue of petitioner's imputed income, so that a final maintenance calculation could be made. Indeed, on June 31, 2019, petitioner filed her motion to reconsider, arguing that the trial court erred in ordering a new date for the parties to establish whether petitioner had received any imputed income. This fact is also reflected in respondent's September 24, 2021, closing arguments, in which he provides that, after having already found a substantial change in circumstances, the "court continued this matter for additional proofs to be submitted based upon the admissions made that [petitioner] had additional sources of income, namely family assistance, which constituted additional income which needed to be taken into consideration in the adjudication of her Counter-Petition for Modification of Maintenance."

¶ 70    The record therefore contains acknowledgments by both parties and the court that, by the time the September 2, 2021, hearing took place, the court had already made its determination of a substantial change in circumstances. While the parties did discuss their current finances at this later hearing, this was not to determine whether a substantial change in circumstances had occurred, but instead, to determine the parties' updated incomes so that a final calculation as to retroactive maintenance could be made, as suggested by petitioner's July 30, 2021, motion *in limine*. For all these reasons, it simply defies logic to suggest—as respondent essentially does here—that the September 2, 2021, hearing formed the basis of the court's May 31, 2019, finding of a substantial change of circumstances. For all of these reasons, we agree with petitioner that

respondent's failure to provide us with a complete record precludes us from finding any basis of error in the trial court's maintenance modification. *Foutch*, 99 Ill. 2d at 392.

¶ 71                                    2. Citations to the Record

¶ 72     Next, because respondent has failed to support his arguments as to the court's imposition of sanctions with adequate citations to the record, his arguments to the point are forfeited. Pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), an appellant's brief shall include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities *and the pages of the record relied on*." (Emphasis added.) The failure to comply with our supreme court's rules of procedure governing appellate briefs "is not an inconsequential matter." *Hall,* 2012 IL App (2d) 111151, ¶ 7. Consequently, where an appellant's arguments are not supported by record citations, those arguments are subject to forfeiture. *In re T.M.H.*, 2019 IL App (2d) 190614, ¶ 37.

¶ 73     Here, petitioner argues that, in his appellate brief, respondent "presents numerous arguments that are not supported by the record whatsoever." Specifically, petitioner points out that, "[i]n total, [respondent's] argument section spans 19 pages, but contains a mere 10 citations to the record, many of which are not directly connected to or relevant to the issues argued on appeal or the evidence adduced at hearing." For this reason, petitioner asserts that respondent's "brief should be stricken and his appeal dismissed."

¶ 74     In return, respondent argues that his arguments were "supported by detailed and specific recitations to the common law record and the report of proceedings to support the specific claims made by [himself]." With regards to his arguments as to the court's imposition of sanctions, respondent specifically contends that "the appellate record contains all pleadings, orders and transcripts of proceedings conducted following the filing of [petitioner's] Motion for Sanctions

through the denial of [petitioner's] Motion to Reconsider." For these reasons, respondent asserts that "no basis exists to prevent this appeal from being adjudicated on its merits."

¶ 75    Here, having already found that we are without basis to review respondent's arguments as to the trial court's modification of maintenance, we consider petitioner's arguments only as they relate to respondent's remaining contentions, which all involve the court's imposition of sanctions. Our review of the corresponding argument sections of respondent's opening brief reveals that, in clear noncompliance with Rule 341(h)(7), his arguments as to the sanctions only included a single citation to the record. Therefore, respondent is categorically incorrect that his arguments were supported by "detailed and specific recitations to the common law record." Accordingly, because respondent's arguments as to the sanctions lack any meaningful citations to the record, his arguments to the point are forfeited. *Id.*

¶ 76    Forfeiture aside, we note that, even if respondent's arguments were properly accompanied by adequate citations to the record, they nonetheless would be without merit. "This court reviews a decision to impose or not impose sanctions under the abuse of discretion standard." *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39, 64 (2008). This standard is the most deferential standard of review, in which reversal is only warranted where the court acted arbitrarily, without conscientious judgment, or exceeded the bounds of reason and ignored pertinent principles of law. *Pierce v. Cherukuri*, 2022 IL App (1st) 210339, ¶ 19. "The circuit court is in the best position to determine how court rules and rules of procedure should be applied in the cases before it, and thus, its decisions are entitled to considerable deference upon review." *Baumgartner*, 384 Ill. App. 3d at 64.

¶ 77    Here, respondent argues that the court erred in imposing sanctions because: (1) petitioner's garbage "was not entitled to Fourth Amendment protections and relief;" (2) respondent's "conduct

was not subject to sanctions pursuant to Supreme Court Rule 219(d); and (3) the court's sanctions "were not based on reasonable criteria."

¶ 78 Respondent's first argument fails because the trial court never based its imposition of sanctions upon any Fourth Amendment analysis. Instead, the transcripts from the court's November 19, 2020, ruling establish that the court sanctioned respondent because "lurking outside of [one's] ex-spouse's home" and "delving into her dumpster to go through whatever she may have put out is not what the Illinois Code of Civil Procedure suggests is the appropriate method for conducting discovery." As a second basis for sanctions, the court noted that it felt as if it "was really misled on [respondent's] motion for the subpoena to [Capital One, LLC]." The court later reiterated these findings in its June 30, 2021, order adjudicating petitioner's request for attorney's fees, finding that it had "previously ruled that *** [r]espondent's conduct in watching his ex-wife's home and going through her garbage to retrieve credit card statement[s] and the conduct of [Weiman] in not being forthright with the court *** was a violation of the discovery rules." The court referenced the Fourth Amendment only one time while making its findings, just to make an analogy establishing why it found suppression of the partial credit card statement, or any evidence flowing therefrom, to be warranted:

> "And I'm going to follow the analysis as I would in a criminal case of the fruits of the poisonous tree. If a police officer obtains evidence in violation of somebody's Fourth Amendment rights, all evidence that was obtained as a result of anything flowing therefrom is subject to suppression."

Still, the fact remains that respondent was not sanctioned for violating petitioner's Fourth Amendment rights. Instead, the court made it clear that he was sanctioned for improperly conducting discovery while acquiring and concealing the partial credit card statement.

Accordingly, because respondent's first argument as to the court's imposition of sanctions rests upon a flawed premise, the argument is unavailing.

¶ 79    In further support of his Fourth Amendment arguments, respondent cites to *Suburban Sew 'N Sweep, Inc. v. Swiss-Bernina, Inc.*, 91 F.R.D. 254 (N.D.I.L. 1981), which he argues "clearly supports the proposition that the acquisition of relevant information which has become discarded refuse does not render the evidence acquired inadmissible, let alone call for all corresponding information to be barred from admission, as a result of the method acquisition." However, our review of the federal, nonbinding case, quickly reveals that it involved a completely distinct, irrelevant issue, "whether documents which would otherwise be privileged as confidential attorney-client communications are no longer so privileged when recovered by a third party from a trash container." *Id.* at 255. Here, no parties raise any issues concerning the attorney-client privilege, and *Suburban Sew 'N Sweep* makes no reference whatsoever to Rule 219 sanctions. Accordingly, the case is inapposite.

¶ 80    Respondent's second argument on the matter, that his conduct was not subject to sanctions, also lacks merit. Pursuant to Illinois Supreme Court Rule 219(d) (eff. Jul. 1, 2002):

> "The court may order that information obtained through abuse of discovery procedures be suppressed. If a party wilfully obtains or attempts to obtain information by an improper discovery method, wilfully obtains or attempts to obtain information to which that party is not entitled, or otherwise abuses these discovery rules, the court may enter any order provided for in paragraph (c) of this rule."

Pursuant to Illinois Supreme Court Rule 219(c) (eff. Jul. 1, 2002), a court:

> "may impose upon the offending party or his or her attorney, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of

reasonable expenses incurred as a result of the misconduct, including a reasonable attorney fee, and when the misconduct is wilful, a monetary penalty."

¶ 81  In arguing that his acquisition of the partial credit card statement was "not subject to sanctions," respondent cites several cases that he suggests are demonstrative of the gamut of sanctionable conduct under Rule 219(d): (1) *Martzaklis v. 5559 Belmont Corp.*, 157 Ill. App. 3d 731 (1987) (attorney was sanctioned for using investigator to intimidate witnesses for information after the close of discovery); (2) *Kilpatrick v. First Church of Nazarene*, 182 Ill. App. 3d 461 (1989) (parties sanctioned for seeking information "to which they knew they were not entitled," resulting in harassment); (3) *Wegman v. Pratt*, 219 Ill. App. 3d 883 (1991) (involving the issue of whether a party's subpoenaing of the presiding judge to testify of "irrelevant matters" warranted dismissal of relevant count under Rule 219(c)); (4) *Sanchez v. City of Chicago*, 352 Ill. App. 3d 1015 (2004) (involving a Rule 219(d) motion for sanctions alleging party submitted "false witness statements procured under false pretenses"); (5) *Baumgartner*, 384 Ill. App. 3d 39 (party sanctioned for subpoenaing opposing counsel for deposition); and (6) *Mehalko v. Doe*, 2018 IL App (2d) 170788 (2018) (involving the issue of whether the trial court properly imposed postjudgment sanctions for party that improperly revealed anonymous social media user's identity in violation of court's protective order). Respondent seemingly reasons that, because his and Weiman's conduct here was distinct and less "egregious" than the sanctioned parties' conduct described in these cases, the court abused its discretion in sanctioning himself.

¶ 82  We reject this argument. Upon our review of the record, we perceive no abuse of discretion by the trial court. Again, the court here provided two bases for sanctioning respondent: (1) because Weiman concealed the existence of the partial credit card statement, misleading the court as to the basis behind the Capital One, LLC subpoena; and (2) because respondent surreptitiously retrieved

financial documents from petitioner's garbage cans in violation of the Highland Park ordinance. The court reasoned that such conduct was not prescribed under the Illinois Supreme Court Rules governing discovery, creating the implicit conclusion that Weiman's and respondent's actions were therefore improper. Respondent points to no authority contradicting this finding.

¶ 83      Furthermore, while we agree that none of the cases respondent cites in his argument involved conduct similar to his own and Weiman's, this does not necessarily mean that respondent's and Weiman's actions were not sanctionable. Otherwise put, respondent has not provided us with any authority suggesting that 219(d) sanctions are limited to those situations presented in *Martzaklis*, *Kilpatrick*, *Wegman*, *Sanchez*, *Baugartner*, or *Mehalko*, and only those situations. Additionally, despite respondent's implicit argument to the contrary, we find his and Weiman's conduct to be sufficiently egregious to warrant sanctions. For all of these reasons, respondent has failed to show that the trial court abused its discretion in its issuance of sanctions.

¶ 84      Finally, we disagree with respondent's last argument on the matter—that the trial court's sanctions were not based upon reasonable criteria. Again, Rule 219(d) specifies that "information obtained through abuse of discovery procedures" may be "suppressed," and Rule 219(c) allows a court to order an offending party to compensate any adverse parties' reasonable expenses incurred as a result of misconduct, or to pay a "monetary penalty" when such misconduct is willful. Ill. S. Ct. R. 219(d) (eff. July 1, 2002); Ill. S. Ct. R. 219(c) (eff. July 1, 2002). "The law in Illinois is well established that imposing sanctions against a party for noncompliance with the discovery rules is within the discretion of the trial judge." *Beasley v. Huffman Manufacturing Co.*, 97 Ill. App. 3d 1, 4 (1981).

¶ 85      In determining whether a trial court has abused its discretion in applying a particular sanction, Illinois courts have considered the following factors: "(1) the surprise to the adverse

party; (2) the prejudicial effect of the proffered testimony or evidence; (3) the nature of the testimony or evidence; (4) the diligence of the adverse party in seeking discovery; (5) the timeliness of the adverse party's objection to the testimony or evidence; and (6) the good faith of the party offering the testimony or evidence." *Reyes v. Menard, Inc.*, 2012 IL App (1st) 112555, ¶ 27. "No single factor is determinative, as each case presents a unique factual situation which must be taken into consideration when determining whether a particular sanction is proper." *Li Jun Huang as Next Friend of Zhaung v. Uribe*, 2020 IL App (1st) 192037, ¶ 44.

¶ 86    After analyzing the above factors in conjunction with a single citation to the record, respondent concludes that, here, "no sanction should have been levied." We disagree. As we have established above, respondent has failed to rebut the trial court's findings that his and Weiman's conduct was not permitted under applicable discovery procedures and rules. Therefore, pursuant to Rules 219(d) and (c), an appropriate sanction—which may have included suppression of evidence, compensation for reasonable attorneys' fees, or a monetary fine—was warranted. The aforementioned six factors—which are mainly relevant in determining how *severe* a particular sanction is appropriate—do not alter this conclusion.

¶ 87    With regards to the factors, we find that the third and final factors—involving the nature of the relevant evidence and the offending party's good faith—align with the trial court's findings and justify the imposition of sanctions. Regarding the third factor—the nature of the partial credit card statement—respondent argues that the information contained in the statement was relevant and that, therefore, no sanction here was warranted. However, respondent completely overlooks the fact that, at its core, the evidence at question here was an unredacted financial document containing private information for both petitioner and Allen—a nonparty—which had been surreptitiously removed from petitioner's curbside in violation of the Highland Park ordinance.

Given the very nature of the unlawfully obtained partial credit card statement, we believe this factor justifies the court's imposition of sanctions.

¶ 88    Concerning the final factor, respondent argues that he "attempted to act in good faith" in procuring the partial credit card statement from petitioner's garbage, as he believed he was "adhering to the directives of the court." This assertion is nothing short of risible. Here, it was clear that both respondent and Weiman exhibited bad faith in procuring the partial credit card statement and in concealing its existence from the court. Again, while arguing in favor of his subpoena to Capital One, LLC, respondent never informed the court of the partial credit card statement's existence, even when his knowledge of the statement was expressly brought into question.

¶ 89    On July 16, 2020, during hearing on petitioner's motion for sanctions, Weiman finally admitted that respondent had retrieved certain documents from petitioner's garbage, almost a year after the August 5, 2019, hearing when petitioner first questioned whether respondent and Weiman had access to the statement. Respondent later admitted that he had repeatedly taken garbage from petitioner's curbside "[l]ate at night," and that he was concerned at the time that his child may have seen him while doing so. Respondent's and Weiman's delay in admitting respondent's conduct, coupled with respondent's concerns of being discovered while removing petitioner's garbage, evince an awareness of their impropriety.

¶ 90    Furthermore, when asked why he had gone through petitioner's garbage, respondent untruthfully testified that he had "been advised by the judge" to do so. Respondent's testimony that he had consulted with the Highland Park police prior to obtaining petitioner's garbage was also highly suspect, as the record is clear that his conduct was violative of a Highland Park ordinance and, indeed, respondent was later formally cited for violating the ordinance. Likewise,

Weiman similarly attempted to ascribe blame to the court for his failure to bring the partial credit card statement to light, falsely stating that the court advised him that disclosure of the statement was unnecessary. We believe that respondent's and Weiman's reluctance to admit their actions, coupled with their deflection of any blame, further evinces their bad faith. Given the application of these two factors—which we find to be determinative—we find that respondent has failed to show that the trial court abused its discretion in issuing its sanctions against himself.

¶ 91                                III. CONCLUSION

¶ 92    For the reasons stated, we affirm the trial court's retroactive modification of maintenance and issuance of Rule 219(d) sanctions.

¶ 93    Affirmed.