2024 IL App (2d) 220230-U
Nos. 2-22-0230 & 2-22-0231 cons.
Order filed February 26, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF TERESA LACH, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Petitioner-Appellant and Appellee, | ) | |
| | ) | |
| and | ) | No. 16-D-879 |
| | ) | |
| JOHN LACH, | ) | Honorable |
| Respondent-Appellee and Appellant. | ) ) | David Christopher Lombardo, Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justice Birkett concurred in the judgment.
Justice Hutchinson concurred in part, and dissented in part.

**ORDER**

¶ 1   *Held*: The trial court's valuation of certain marital real property was not against the manifest weight of the evidence, as respondent was competent to testify to its value, and the trial court did not err in awarding the real property to respondent rather than order its sale. The trial court's finding that respondent dissipated marital assets was not against the manifest weight of the evidence where respondent failed to show by clear and specific evidence that funds were used for a marital purpose. The trial court's finding that respondent dissipated other marital assets was against the manifest weight of the evidence. We do not reach the issue of whether the overall distribution of marital property was equitable, because the trial court failed to make sufficient findings regarding the value of the marital debts and obligations. The trial court has authority to order respondent to indemnify petitioner against marital liabilities, including a provision for attorney fees. Further, the 19th Judicial Circuit's local rule does not require the trial court to first appoint special counsel

before making a finding as to whether respondent's petition for adjudication or indirect criminal contempt has demonstrated probable cause. Respondent has forfeited review of whether his petition for adjudication of indirect criminal contempt had established probable cause to find petitioner's trial counsel in contempt of court. Affirmed in part and reversed in part. Cause remanded with directions.

¶ 2 In separate appeals John and Teresa Lach both challenge the trial court's judgment for dissolution of marriage. The marital estate consisted primarily of the parties' retirement accounts and real estate in Illinois, Colorado, and Nevada. Since 2015, John has received millions of dollars in loans from his parents Ron and Pamela Lach and his brother Michael Lach secured against the marital properties. Several of the properties are also encumbered by mortgages with traditional financial institutions.

¶ 3 The trial court's judgment for dissolution of marriage awarded the entirety of the parties' retirement accounts and certain real property to Teresa. John was awarded the remaining real property. The trial court found that John had dissipated $1,400,000 in marital assets in certain transactions with his father and brother. In consideration of the dissipation and John's role in encumbering the marital properties with familial loans, the trial court assigned almost all of the marital debt to John and ordered him to indemnify Teresa against claims arising from the debts secured by the property awarded to her, including attorney fees. Among the properties awarded to John were approximately 71 parcels of vacant land in Nevada, which John had purchased through MLL Inc., a company he formed with his brother (MLL properties).

¶ 4 On appeal, Teresa is challenging the trial court's valuation of the MLL properties and their award to John. John is challenging the trial court's finding that he dissipated marital assets, the trial court's authority to order him to indemnify Teresa, and the overall equitability of the distribution of marital property, chiefly the trial court's decision to assign him the majority of the marital debts. John is also challenging the trial court's order dismissing his petition for adjudication

of indirect civil contempt directed against Teresa's trial counsel Michael Weiman. For the following reasons we affirm in part, reverse in part, and remand for further proceedings consistent with this order.

¶ 5                                     I. BACKGROUND

¶ 6     John and Teresa were married on August 22, 1992. During their marriage they had three children, all of whom had reached adulthood by the time of trial. On May 10, 2016, Teresa filed her petition for dissolution of marriage in the circuit court of Lake County. The matter proceeded to trial on February 10, 2020. The trial took place over the course of 28 days. Due to the COVID-19 pandemic, there were significant delays in the proceedings, and the trial did not conclude until September 27, 2021. The witnesses called at trial included, *inter alia*, John and Teresa, John's brother Michael, and John's father Ron. Much of the trial centered around the various investment properties John had purchased during the marriage, and the loans he took to finance their purchase and improvement.

¶ 7                                   A. General Background

¶ 8     John and Teresa began dating in fall of 1986. That same year John purchased a condominium at 440 N. Main Street, Unit E101 ("E101") in Wauconda, Illinois, which he rented out to tenants.

¶ 9     In 1987, John worked as a real estate broker but quit to begin buying and selling properties himself. John had been self-employed ever since.

¶ 10    From 1990 to 1997, Teresa worked for Hewitt Associates as a systems analyst. She quit after the parties' second child was born.

¶ 11    From 1990 to 1998, John purchased several buildings for the purpose of converting them into condominiums. In the process he received "ten or more" loans from his parents to finance his

projects. All of these loans were repaid. In the fall of 1998, John and Teresa visited Colorado for three or four months to take a break from John's real estate projects. When they returned to Illinois, John purchased another property and financed its construction with a loan from his parents signed by both him and Teresa. This was the only loan agreement produced to which Teresa was a signatory. That loan was also repaid.

¶ 12    In 1996, John purchased 440 N. Main Street, Unit E106 ("E106") in Wauconda, Illinois, which was a unit in the same building as E101. John also rented out this unit.

¶ 13    In 1999, John and Teresa purchased a vacant lot at 63 Hillburn Lane ("63 Hillburn") in North Barrington, Illinois with the intention of building a home. They acquired the property using an institutional mortgage, which has since been paid in full.

¶ 14    In 2000, John and Teresa purchased lakefront property at 5 Lakeview Place in Lake Zurich Illinois, as the parties wished to own lakefront property. The property contained a house, which at the time of trial was not habitable, and a boathouse. It was Teresa's desire to be awarded the property to use as her residence.

¶ 15    In early 2001, John purchased a vacant commercial building at 4611 Clark Street ("4611 Clark") in Chicago Illinois with a $792,000 mortgage through LaSalle Bank. In 2004, John refinanced the LaSalle Bank mortgage on 4611 Clark with a loan from his parents in the amount of $792,000. The loan's maturity date was November 12, 2011, however, no payments were made, and at the time of trial, the property was in foreclosure.

¶ 16    In 2002, John purchased 5315 N. Ravenswood Avenue ("5315 Ravenswood") in Chicago, Illinois for approximately $750,000. The property was also vacant. John's goal was to convert the building into condominiums and commercial space. At the time of trial, Albany Bank had assumed the mortgage on the property.

¶ 17    In 2003, John purchased 1403 W. Rascher which would be his last successful condominium conversion.

¶ 18    Around 2003, John invested approximately $1.75 to $2.75 million in Flex Fitness, a company which manufactured fitness equipment. On November 2, 2004, John sold his stake in Flex Fitness, breaking even on his investment.

¶ 19    John's brother Michael had been successfully buying and selling land in Pahrump, Nevada. John wanted to get involved and they formed MLL, Inc. (MLL), on July 14, 2004. From early 2005 to late 2006, MLL purchased approximately 100 properties. The brothers arranged that John would loan the purchase money for the properties and Michael would be responsible for selling and managing the properties. From early 2005 to late 2006, MLL, Inc. purchased around 100 properties in Pahrump for over $2 million. During this timeframe, MLL sold approximately 15 parcels of land for a substantial profit. Since the recession and housing market crash in 2008, MLL had purchased only two parcels of land, both of which adjoined other MLL parcels, and had sold one parcel in 2019. According to Michael, that parcel had been purchased for approximately $8000 between 2004 and 2006 and sold for $5800.

¶ 20    At the time of trial, MLL owned 71 parcels, which had been purchased for approximately $2.45 million. According to Michael, at the time of trial, MLL owed John $3,041,226.51 and owed Michael $33,226.51 with Michael's loan having priority over John's.

¶ 21    MLL had no written partnership agreement, but John and Michael testified that pursuant to the brothers' oral agreement, John was entitled to 51% of the profits and Michael was entitled to 49%. However, Michael did not expect to see any kind of return on the properties, as the housing market crash and growing cost of water rights had diminished the value of the properties. An additional 10 parcels of land were held in John's PENSCO retirement account.

¶ 22     In 2006, John and Teresa purchased a home at 53 Knudson Ranch Road ("53 Knudson") in Edwards, Colorado for their personal use. At the time of trial, Bank of America held a mortgage on the property.

¶ 23     In 2008, John and Teresa purchased a home at 18 Wynstone Way ("18 Wynstone") in North Barrington, Illinois. John and Teresa used 18 Wynstone as their marital residence from 2008 onward.

¶ 24     On November 25, 2008, John received a wire transfer of $500,000 from his parents. John testified that this money was a loan to finance construction at 5315 Ravenswood. John would ultimately not use these funds for 5315 Ravenswood.

¶ 25     In December 2008, Teresa loaned John approximately $100,000 that she had inherited from her parents. Teresa testified that the money was to be used for improvements at 5315 Ravenswood, but the handwritten loan document instead indicated it was for personal expenses.

¶ 26     Around August 2009, Michael offered John the opportunity to invest in a commercial property at 151 Humahuaca Street in Pahrump, Nevada. Michael and John formed 151 Group, LLC, to manage the investment. Pursuant to the terms of the operating agreement, John was entitled to receive double his investment of $200,000, whereupon his interest in the property would cease. The trial court would ultimately find that John had been paid in full for his investment and that his interest in the property had been extinguished.

¶ 27     In 2010, John invested $250,000 in a property in Florida (the Marlac property) with Sean and Drake Margiotta through Marlac, LLC (Marlac). John testified that the $250,000 came from the reallocation of the $500,000 he had been lent for 5315 Ravenswood in 2008. He presented a handwritten agreement dated June 3, 2010, which purported to restructure the $500,000, 5315 Ravenswood loan to provide $250,000 for the Marlac investment and the remaining $250,000

would be an equity loan against 5 Lakeview. The purported agreement provided that John's parents would share in the profits from the sale of the Marlac property at an increasingly disproportionate rate. If the property sold within two years, the profits would be split 50/50, with John's percentage decreasing by 10% each year until after six years John would receive 10% of the profits and his parents would receive 90%. The trial court would ultimately find this agreement was not legitimate.

¶ 28    In March 2011, Michael offered John an opportunity to invest in a commercial property at 1017 E. Basin Avenue in Pahrump, Nevada. Similar to 151 Group, LLC, the parties formed 1017 Group, LLC, to manage the property. John was again entitled to double his investment of $125,000, and the trial court eventually found that his interest in the property had been extinguished.

¶ 29    In April 2011, John purchased a duplex at 5685 E. Wildridge Road ("5685 Wildridge") in Avon, Colorado for approximately $549,000 in cash with the intent of flipping the property. John sought to refinance the property but could not get a bank to do so. He then approached his and Teresa's friend Matt Gelinas. On August 17, 2011, John would receive a loan from Matt and Jenny Gelinas in the amount of $380,000 secured against 5685 Wildridge.

¶ 30    In September 2012, Michael, through an entity called Lambertucci Roma, lent John $600,000 in three installments. This loan was secured against 5685 Wildridge.

¶ 31    In August 2013, John's parents hosted a party in California to celebrate their fiftieth anniversary. All of the family except for Teresa attended. While John was in California, Teresa went with her sisters to meet with a divorce attorney.

¶ 32    The trial court found that the marriage had irretrievably broken down beginning in 2015.

¶ 33    In 2015, John sold 5685 Wildridge. From the proceeds of the sale, on July 8, 2015, he repaid Michael approximately $650,000 for the Lambertucci Roma loan. He repaid the Gelinas $140,000 of the $380,000 he owed them.

¶ 34    In August 2015, Teresa took a job as a server at the Wynstone Golf Club.

¶ 35    On August 3, 2015, Michael loaned John $600,000 through Lambertucci Roma which was paid in two installments and memorialized by a promissory note against John's interest in the Pahrump Nevada properties, 4611 Clark, and the "proceeds from the sale of any other investment that John Lach has an interest in." John testified he used these funds to pay the parties' expenses and maintain the marital properties.

¶ 36    On February 14, 2016, Teresa began working full time at Paylocity as a data specialist earning $50,000 per year.

¶ 37    On October 13, 2016, John received the second $300,000 installment from Lambertucci Roma.

¶ 38    From June 2017 to November 2019, John borrowed $500,000 from his parents in $100,000 increments to fund construction at 5315 Ravenswood. This loan was secured against 5315 Ravenswood.

¶ 39    On August 2, 2018, John's parents loaned him $380,000 secured by a deed of trust against 53 Knudson. John used part of the loan to repay the amount remaining on the loan from the Galinas, and the remainder to pay household expenses.

¶ 40    On January 11, 2019, Teresa moved out of 18 Wynstone. In August 2019, Teresa began working at Dovenmuehle Mortgage earning $25.64 per hour.

¶ 41    In April 2019, Albany Bank made a demand for repayment in the amount of approximately $1.6 million, which was owed on 5315 Ravenswood. In order to pay down the mortgage, John

borrowed $1.1 million from Michael through Grow Nevada, LLC, and secured against 5315 Ravenswood. The loan was initially to be repaid by October 30, 2019, but was extended for an additional 12 months with an additional $30,000 being loaned. At the time of trial, John had not made any payments towards the loan, and Albany Bank filed a complaint for foreclosure in May 2021.

¶ 42    The trial court entered judgment for dissolution of marriage on February 14, 2022. The parties had stipulated to the value of all real estate, with the exception of the properties in Pahrump, Nevada. Based on the parties' stipulated values, the trial court divided the real property as follows:

| Property | Value | Awarded to |
|---|---|---|
| 5315 Ravenswood | $1,680,000 | John |
| 53 Knudson | $1,025,000 | John |
| 63 Hilburn | $80,000 | John |
| E101 | $98,000 | John (as premarital property) |
| 18 Wynstone | $680,000 | John |
| 4611 Clark | $817,500 | Teresa |
| 5 Lakeview | $500,000 | Teresa |
| E106 | $108,000 | Teresa |

The trial court awarded John his properties "subject to all debt, liabilities, past due taxes, attorneys fees, institutional, family loans, mortgages and all the incumbrances [*sic*]" and ordered that John "indemnify and hold Teresa harmless from any liability thereon and shall be solely responsible for repayment of all loans." Teresa was awarded her properties subject to debts and liabilities "not otherwise addressed in the judgment." The only such debt discussed by the parties on appeal is the PNC mortgage against 5 Lakeview. Teresa was awarded the parties' retirement accounts, which the trial court valued at approximately $500,000. The trial court found that Teresa had dissipated $114,000 from the parties' retirement accounts, which it offset against the $100,000 loan Teresa had given John in 2008. No maintenance was awarded to either party.

¶ 43    The trial court found that John had dissipated marital assets in the amount of $600,000 from the second Lambertucci Roma loan, and $860,000 from the transfer of the Marlac property sale proceeds to his parents.

¶ 44    The trial court found that at the commencement of trial all the properties were current on their institutional mortgages, taxes, and insurance, and that prior to trial, John's parents had never instigated collection litigation against him for any outstanding debts. At the time of dissolution, 5315 Ravenswood and 4611 Clark were both in foreclosure, and John's family had placed liens on the properties, with Michael placing liens on all properties owned by the parties or controlled by John.

¶ 45    The trial court expressed doubt as to whether John's family would pursue action against him and the properties awarded to him following the dissolution, but anticipated such actions against Teresa. In light of the dissipation, the dissolution judgment ordered John to indemnify Teresa against claims arising from his familial debts:

> "Due to the uncertainty and the significant dissipation, John shall be responsible for removing any lien or otherwise shall indemnify Teresa for any forthcoming claims by Ron Lach or Michael Lach personally or [d/b/a] Lambertucci Roma, Grow Nevada or any other entity in the control and direction of Michael Lach against the real estate awarded to Teresa. All reasonable costs of defending rights of action, enforcement of liens, mortgages or promissory notes resulting from agreements entered into by John and the aforementioned individuals or entities against the properties awarded to Teresa shall be included in John's obligation to indemnify Teresa."

¶ 46    The trial court's order was silent regarding the MLL properties, and both parties moved to reconsider. John argued that he should be awarded the MLL properties, and Teresa argued that

they should be sold, and the proceeds split equally between the parties. On reconsideration, the trial court stated that the parties had stipulated a value of $470,000 for the properties and awarded them to John. However, no such stipulation appears in the record. Additionally, the motion was silent regarding the refinancing of the PNC mortgage against 5 Lakeview. John asked that the trial court order Teresa to refinance the loan within 60 days. In response Teresa requested 180 days in which to refinance the mortgage. The trial court's order on the parties' motion to reconsider was likewise silent as to the refinancing of the mortgage on 5 Lakeview.

¶ 47    The parties timely appealed from the trial court's dissolution judgment.

¶ 48                              B. Valuation of MLL Properties

¶ 49    On February 10, 2020, Teresa filed a motion *in limine* seeking to bar the introduction of any evidence as to the value of the MLL properties. In that motion, Teresa argued that on February 5, 2020, John submitted his trial exhibits, including respondent's exhibit 154, which was a list of the MLL properties prepared by Michael using information he found on the Nye County Assessor's website. The exhibit included the "net assessed value" and "taxable value" for each of the properties. Teresa argued that because this exhibit had not been tendered prior to February 5, 2020, John should be barred from introducing it into evidence. Likewise, the motion argued that John had failed to disclose any experts who would testify to the value of the MLL properties, and such testimony should likewise be barred. The trial court reserved the issue for trial.

¶ 50    At trial, John sought to elicit testimony from Michael regarding the value of the MLL properties. Teresa objected and the trial court sustained the objection, finding that Michael had not been disclosed as an opinion witness. John then made an offer of proof. In the offer of proof, Michael testified that he had been in contact with Teresa's counsel and that he had been asked about meeting with an appraiser. Michael told Teresa's counsel that he would make himself

available to meet with the appraiser, but never heard anything back. Michael then explained how prior to his deposition he had not prepared a list of the MLL properties, because he did not understand what Teresa's counsel had meant when he had asked for a "ledger." At the deposition, he told Teresa's counsel that the information for the MLL properties could be accessed online and directed him as to where and how to access the information. Michael prepared respondent's exhibit 154 after the deposition and sent it to John. Michael did not ultimately provide a value for the MLL properties in his offer of proof. Respondent's exhibit 154 was then admitted into evidence with the "net assessed values" and "taxable values" omitted.

¶ 51 Teresa introduced into evidence a loan application to Meadows Bank prepared by John and signed by him on November 11, 2012. In that application, John represented that he owned 77 lots in Pahrump, Nevada worth $3,722,000.

¶ 52 Later, John sought to testify to the value of the MLL properties. Teresa objected, arguing that there was insufficient foundation for John's opinion, as he had never visited the properties and was not directly involved in the acquisition of the properties. Teresa also argued that John's opinion had not been disclosed. John maintained that the opinion had been disclosed. The trial court overruled the objection. John testified that in his opinion, the MLL properties were worth $470,000. He testified that his opinion was based on the valuation of the properties by the Nye County Assessor, discussions with Michael, research John had completed on real estate websites Redfin and Zillow, and the recent sale of one parcel in 2019.

¶ 53 In its order on the parties' motions to reconsider, the trial court stated:

"The Court has considered the evidence presented at trial in reaching this decision. The record is clear that John alone used significant marital funds to pursue this venture without involvement of Teresa. He alone is knowledgeable as to how the lots may be

improved, sold, or developed. That the assets are intertwined with Michael is an additional consideration. John alone can realize any investment potential and he should be awarded the asset rather than simply force a sale as Teresa suggests."

¶ 54                                C. Dissipation and Marlac, LLC

¶ 55    In finding that John had dissipated the $600,000 he received from the second Lambertucci Roma loan, the trial court stated in the dissolution judgment that:

"John has not demonstrated how the money received was used for a marital purpose. To the contrary, the evidence clearly shows Teresa had no knowledge of the funds received, no access to the former marital bank account as John carefully segregated all monies to accounts under his exclusive control. John continued to live a lifestyle consistent with the best of times while Teresa relied solely on income from her part time waitress position. Ultimately, John would live in the former marital residence with a new paramour and her child, take vacation cruises and trips to destinations in Europe as well as frequent travel to the Colorado home for leisure. The expenditure of the $600,000.00 solely by John and for the benefit of John is found to constitute dissipation."

¶ 56    Further, the trial court made it clear in its order regarding the parties' motions to reconsider that it did not find John credible regarding the marital use or purpose of the $600,000, stating, "John is not credible as to the marital use or purpose of the monies borrowed from Lambertucci Roma."

¶ 57    Regarding Marlac, John testified that in November 2008, he had obtained a loan of $500,000 from his parents for improvements to 5315 Ravenswood. This testimony was supported by bank statements from his parents showing two transfers of $100,000 and $400,000 on November 25, 2018. No other documents memorializing this loan were introduced. John explained

that due to the housing market crash, he ultimately did not move forward with the planned improvements to 5315 Ravenswood. Around 2010, John learned of an opportunity to invest in a vacant property in Naples, Florida from his friend Sean Margiotta. John approached his parents about using $250,000 from the loan for 5315 Ravenswood to invest in the Naples property. John's parents ultimately agreed, and they entered into a handwritten agreement dated June 3, 2010. The agreement read as follows:

"6-3-10        The $500,000 loan from Ronald & Pamela Lach intended for construction costs on Ravenswood isn't being used and is sitting in the bank.

Parties agree to the following

1. $250,000 is to be used as an equity loan against 5 Lakeview Place at 5% interest for 5 years.

2. $250,000 is to be invested in the purchase of land in Naples, Florida thru John Lach in a newly formed partnership or corp. with other partners. Any profits from a sale will be split as follows:

| If sold within | 2 years, 50% to Ron & Pam | , | 50% to John |
| --- | --- | --- | --- |
| | 3 years, 60% " " | , | 40% to John |
| | 4 years, 70% " " | , | 30% " " |
| | 4 years, 80% " " | , | 20% " " |
| | 4 years, 90% " " | , | 10% " " |

[Signed by John, Ron, and Pamela Lach]"

John explained that the reason for the profit shifting arrangement was that it was supposed to be a short-term investment, and to ensure "fairness" to his parents. John's testimony was corroborated by Ron, who testified, "I had set it up because I didn't want it to be a long drawn-out thing with

my money. It was supposed to be fast. And as an incentive to get this done, I got an increasing higher percentage every year."

¶ 58     John went on to form Marlac, LLC, with Sean Margiotta and his brother Drake. Each initially contributed $250,000. John testified that although his parents had provided the $250,000 for his share, Sean and Drake wanted John involved due to his real estate expertise and did not want to enter into an agreement with his parents directly. A settlement statement from Noble Title & Trust, LLC, was admitted into evidence and showed that Marlac purchased the vacant property on August 13, 2010, with financing through Huntington Bank. John testified that additional funds were later required to pay off the Huntington Bank mortgage, requiring each member to contribute around $135,000. John approached his parents about repaying the mortgage, but they were unwilling to put in any additional money. Sean ultimately agreed to advance $100,000 for John's share. The property was sold on July 16, 2018, for $2,489,957.75. John and Ron both testified that Ron repaid the $100,000 advanced by Sean from his portion of the sale proceeds. A wire transfer from Pamela Lach to Sean for $100,000 dated July 20, 2018, was admitted into evidence.

¶ 59     A copy of a check from Marlac to Ron dated April 21, 2018, for $43,000 was admitted into evidence, as was a bank statement showing that on July 19, 2018, Marlac sent a wire transfer to Ron for $825,000. John testified that the $43,000 check was his father's share of the earnest money for the sale of the property and the $825,000 wire was his share of the sale proceeds. John testified that under the terms of the original $500,000 loan for improvements to 5315 Ravenswood, he owed his parents $37,500 in interest. Likewise, Ron had advanced John $30,000 on May 8, 2017, in anticipation of the sale of the property. John had then paid Sean $13,607 in interest for the $100,000 advanced by Sean. As a result, John claimed he still owed his parents $178 from the Marlac agreement, even taking into account his 10% of the profits.

¶ 60    Regarding the distribution of the profits from the sale of Marlac, the trial court stated in its dissolution judgment:

> "[The purported agreement] is a document handwritten by John which is signed by his parents and by John. The document is not dated, nor the signatures notarized. *** Ron is not named as a member of Marlac and served in no capacity on its behalf. John would later transfer 90% of his share of the profits to his father in 2018, two years into the divorce litigation. John testified the agreement represented Ron's desire for a quick repayment schedule. This rationale lacks credibility as Ron had not attempted to recoup his $500,000.00 for two years despite John doing no work with the funds. Further, the Court notes John had unrelated accessible funds per his testimony, including the alleged $250,000.00 equity loan described herein. The profit sharing with Ron wrongfully deprived the marital estate its rightful asset return of a third of the sale price of $2,625,000.00 less closing costs of $35,881.50 and the Court finds it was not a legitimate agreement but an attempt to secrete marital assets from Teresa."

¶ 61                 D. Petition for Adjudication of Indirect Criminal Contempt

¶ 62    On February 18, 2020, while cross-examining Ron, Teresa's counsel, Michael Weiman, sought to question him regarding respondent's exhibit 156, which was a selection of pages from a 999-page document relating to Ron's Wells Fargo Bank account. John objected, claiming he had not received the underlying document in discovery, and that he had not received the subpoena for the document. Weiman claimed that his office had tendered all subpoenas and documents to opposing counsel. John then moved to strike the questions and answers related to exhibit 156, and the trial court said,

"Well, I'm going to require that the subpoena be produced, the date that you served notice of the subpoena, and whatever you believe you have tendered to Mr. Del Re by way of discovery that relates to this 999 pages of this particular checking account. You're not going to ask any questions about it until we've done that, so we can have a recess at some point, I'm sure."

¶ 63    The next day, on February 19, 2020, John's counsel clarified that he had received a subpoena for Wells Fargo dated November 27, 2019, and sent a letter to Weiman's office requesting any documents that had been produced in response to the subpoena. Weiman acknowledged that his office received the letter but claimed he had not been personally aware of it. Weiman also acknowledged that his office had not tendered the documents they had received from Wells Fargo. The trial court ordered Weiman to turn over the Wells Fargo documents, stating:

"THE COURT: All I heard today was due to confusion or whatever you want to call it, you acknowledge that whatever you received by way of subpoena to Wells Fargo, those documents haven't been forwarded to the other side.

MR. WEIMAN: Correct.

THE COURT: Get it done today."

¶ 64    John filed a petition for adjudication of indirect criminal contempt. John's motion to reconsider states that it was filed on March 13, 2020. However, the original file-stamped petition does not appear to be in the record, with the only copy appearing as an exhibit to John's motion to reconsider. This copy was not file-stamped or dated.

¶ 65    The petition alleged the following. On November 27, 2019, Weiman issued a subpoena to the Lake Elsinore, California branch of Wells Fargo requesting documents related to the accounts of Ron and Pamela. The subpoena and notice were attached as exhibits. On December 2, 2019,

John's counsel sent a letter to Weiman requesting copies of all documents received pursuant to the subpoena. This was also attached as an exhibit. Weiman did not tender any documents in response to the letter, because Wells Fargo refused to comply with the subpoena. A letter from Wells Fargo dated December 3, 2019, was attached as an exhibit. In that letter Wells Fargo indicated it would not comply with the November 27, 2019, subpoena as it was "not served within the state of issuance." Weiman did not tender this letter to John's counsel, who obtained it after Ron requested documentation from Wells Fargo.

¶ 66    Weiman issued a second subpoena dated February 3, 2020, directed at Wells Fargo's subpoena compliance officer in Evanston, Illinois. This subpoena had a return date of February 5, 2020. Along with the subpoena, Weiman sent a letter which read:

> "The attached subpoena was initially served on or around November 27, 2019. However, a response has never been received and the underlying action is set for trial to begin on February 10, 2020. As a result, we have requested a very short date for the return of the subpoena and respectfully request your assistance in expediting a response to the subpoena as quickly as possible. Please contact me at your earliest possible convenience to discuss this matter."

Notably, the attached subpoena had not been issued on November 27, 2019, as the attached subpoena was the second subpoena which was issued on February 3, 2020.

¶ 67    The petition claimed that John's counsel did not receive notice of the February 3, 2020, subpoena from Weiman, nor did he receive the documents which were produced pursuant to the subpoena. The letter and second subpoena were obtained pursuant to Ron's request for documents.

¶ 68    The petition alleged that Weiman violated Lake County Local Rule 2-2.10(B, E) as Weiman did not send John's counsel a copy of the subpoena with proof of service, and because

the subpoena was made returnable less than seven days following the date of service. 19th Judicial Cir. Ct. R. 2-2.10(B, E) (eff. Oct. 24, 2016). John also claimed that the two-day return date violated section 48.1 of the Illinois Banking Act (205 ILCS 5/48.1 (West 2020)). The petition further alleged that Weiman made false statements to the trial court to the effect that on February 18, 2020, he falsely claimed to have sent copies of all subpoenas and all documents received to opposing counsel. Finally, John alleged that Weiman violated the trial court's order that he turn over the subpoena and documents produced, as he never produced the February 3, 2020, subpoena.

¶ 69    In the dissolution judgment, the trial court declined to appoint special counsel and dismissed the contempt petition. In its ruling on the parties' motions to reconsider, the court stated, "The Court has considered the arguments of counsel and the Court's recollection of events and finds John has failed to demonstrate probable cause in support of a finding of direct criminal contempt."

¶ 70                                    II. ANALYSIS

¶ 71    Before we begin our analysis, we are compelled to discuss various shortcomings in the materials presented to the court, which have impeded our review of this case. The argument sections of both Teresa's opening brief and response to John's opening brief are largely bereft of citations to the record as required by Illinois Supreme Court Rule 341 (h)(7), which provides that the argument section "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341 (h)(7) (eff. Oct. 1, 2020). Additionally, Teresa's appendix does not comply with Illinois Supreme Court Rule 342 (eff. Oct. 1, 2019), as it contains a proposed judgment for dissolution of marriage which is not part of the record. John has requested that we strike both briefs and dismiss Teresa's appeal.

¶ 72    The underlying trial consisted of 28 days of proceedings held between February 10, 2020, and September 27, 2021. The report of proceedings is more than 4300 pages long, as are the trial exhibits. The parties are far more familiar with the details of the underlying case than we are, and it falls upon them to guide us to the appropriate portions of the record. " 'A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' " *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 474-75, (2010) (quoting *Pecora v. Szabo*, 109 Ill. App. 3d 824, 825-26 (1982)).

¶ 73    In the interest of justice, we decline to take the drastic action of striking Teresa's briefs. However, to the extent that we feel our review of the case is impeded by the lack of citations to the record, we will decline to consider those arguments. Likewise, we will not consider any documents that are not part of the record.[1]

¶ 74    We also do not have the parties' written closing arguments. While closing arguments are not evidence (see *Simmons v. Garces*, 198 Ill. 2d 541, 571, (2002)), they are helpful in understanding what arguments and evidence the trial court considered in reaching its judgment and should be included. To the extent that the absence of the closing arguments impedes our review, we shall resolve any uncertainties against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389,

---

[1]This is not the first time we have had to address counsel Weiman's failure to provide proper citations to the record in accordance with Supreme Court Rule 341(h)(7). See *In re Marriage of Bernstein*, 2023 IL App (2d) 210623-U, ¶¶ 72-75. We admonish him to abide by the Supreme Court Rules in any future appeals.

392 (1984). We have noticed in cases where the parties present written closing arguments, the arguments are not always preserved in the common law record. We caution attorneys and court staff to take measures to ensure that these records are properly filed and preserved for review.

¶ 75    Finally, the order for dissolution of marriage, which we will discuss further, fails to sufficiently account for millions of dollars in marital obligations. Instead, it disposes of the marital debt in a summary manner, without any attempt at quantifying the amount of debt it is allocating to the parties. The lack of factual findings on the matter—exacerbated by the lack of the parties' closing arguments—impairs our ability to assess the overall fairness of the trial court's distribution of the property.

¶ 76                              A. Issues on Appeal

¶ 77    Teresa argues that the trial court's valuation of the MLL properties at $470,000 was against the manifest weight of the evidence, and, therefore, its award of the properties to John was an abuse of discretion.

¶ 78    John raises several issues. He argues that the trial court's finding that he dissipated marital assets from the second Lambertucci Roma loan and proceeds from the sale of the Marlac property was against the manifest weight of the evidence, and therefore its allocation of the dissipation was an abuse of discretion; that the trial court's allocation of marital debts was inequitable and therefore an abuse of discretion; that the trial court abused its discretion in ordering John to indemnify Teresa for claims against the properties awarded to her as it lacked authority to do so; and that the trial court abused its discretion in dismissing his petition for adjudication of indirect criminal contempt against Weiman.

¶ 79                              B. Valuation of MLL Properties

¶ 80　As a preliminary matter, John argues that Teresa has forfeited her argument regarding the valuation of the MLL properties by failing to contest John's valuation in her motion to reconsider. We do not find that Teresa forfeited her argument. The original dissolution judgment stated that John testified that, in his opinion, the properties were worth $470,000. The trial court did not make a finding as to whether it accepted John's opinion. Teresa's position in her motion to reconsider and on appeal has been that the trial court should have ordered a sale of the properties. As such, she has not forfeited her argument. In addition, despite the trial court's finding that the parties had stipulated to a value of $470,000 for the properties, there is no indication that Teresa made such a stipulation. Teresa's argument before the trial court in her motion to reconsider, and on appeal, has been that the only way to arrive at a fair value for the MLL properties is to order their sale.

¶ 81　Teresa argues that the trial court erred in ascribing any value to the MLL properties, as the only evidence regarding the value of the MLL properties was John's opinion testimony, which lacked proper foundation. Specifically, she contends that John was incompetent to testify to the value of the MLL properties as John had no personal knowledge regarding any of the MLL properties. She argues that, accordingly, the trial court abused its discretion in awarding the MLL properties to John and that the court instead should have ordered the sale of the MLL properties.

¶ 82　"The valuation of marital assets in a dissolution of marriage proceeding is a question of fact that will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 151-52 (2005). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). "A trial court's distribution of marital property rests within its sound discretion and will not be disturbed absent an abuse of discretion." *In re Marriage of Los*, 136 Ill.

App. 3d 26, 30, (1985). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court" *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 83    Under Illinois law, an owner of land is generally considered competent to render an opinion as to the value of the property, as "[o]wnership of land usually indicates knowledge of the price paid for land, the income generated by it, and potential uses of the land, such that the owner likely has a reasonably good idea of the land's value." *Hill v. Ben Franklin Savings & Loan Ass'n*, 177 Ill. App. 3d 51, 56 (1988). However, "[a] landowner may be shown to be incompetent to testify where it is affirmatively shown that special circumstances exist which indicate that [they are] unfamiliar with facts which give the property value." *Id.* In support of her claim that John was incompetent to testify regarding the value of the MLL properties, Teresa cites *In re Marriage of Vucic*, 216 Ill. App. 3d 692, 696 (1991). In *Vucic*, the wife testified the property was worth $200,000 based on a valuation she received from an unnamed appraiser. *Id.* The trial court found this to be insufficient. *Id.* at 703-04.

¶ 84    In the instant case, although John had never visited the MLL properties, we believe he was competent to testify as to their value. He was familiar with the price paid for the properties, the improvements and income generated by the properties (none), and the potential uses for the property. It was John's business to buy, sell, and develop properties, and he had bought these properties as investment properties. Additionally, John and Michael had recently sold one of the parcels in 2019. Accordingly, the fact that John had never personally visited the properties was not enough to show that special circumstances existed such that John was unfamiliar with the facts which give the properties value.

¶ 85    Further, it is the responsibility of both parties in a dissolution proceeding to provide the court with sufficient evidence of the value of their property. *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 39. Teresa claims she was prevented from providing evidence of the value of the MLL properties by the late disclosure of the full list of the properties. We disagree.

¶ 86    Although John may not have disclosed a complete list of the properties until shortly before trial, Michael testified that he provided Teresa's counsel with the information necessary to find a list of the properties on the Nye County Assessor's website. Following these instructions, we were readily able to locate a list of the MLL properties and their property tax valuations. Further, Michael testified that Teresa's counsel had emailed him about a meeting with an appraiser in Pahrump, which Michael had agreed to do. Finally, the trial lasted more than a year and a half. Teresa could have asked for leave of court to obtain an appraisal. Indeed, this would have been preferable under the law, as assets should be valued as near in time to the dissolution as possible. *Wojcik*, 362 Ill. App. 3d at 152. It is readily apparent that Teresa's strategy throughout the trial was to attempt to bar any evidence of the value of the MLL properties in order to force a sale. This kind of conduct is not to be rewarded. See *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 45. ("Neither party should be allowed to benefit on appeal from their own failure to introduce competent evidence of value at trial.")

¶ 87    Accordingly, we affirm the trial court's valuation of the MLL properties at $470,000 and find that it did not abuse its discretion in not ordering the sale of the MLL properties.

¶ 88                                      C. Dissipation

¶ 89    John challenges the trial court's determination that he dissipated marital assets. Dissipation is premised on waste and contemplates the diminution of the marital estate due to a spouse's actions. *In re Marriage of Miller*, 342 Ill. App. 3d 988, 994 (2003). Dissipation typically takes the

form of a spouse's use of marital property for their own sole benefit, but dissipation may be found in instances where the dissipating spouse did not personally benefit. *Id.* Whether dissipation occurred is a question of fact, which we review under the manifest-weight-of-the-evidence standard. *Id.* Once a party alleging dissipation establishes a *prima facie* case, the party charged with dissipation must show by clear and specific evidence how the marital funds were spent. *In re Marriage of Katsap*, 2022 IL App (2d) 210706, ¶ 142. General and vague statements that funds were spent on marital expenses or to pay bills are insufficient to rebut a claim for dissipation. *Id.* "[D]issipation is calculated from when the parties' marriage *began* undergoing an irreconcilable breakdown." (Emphasis in original.) *In re Marriage of Sinha*, 2021 IL App (2d) 191129, ¶ 33.

¶ 90      The trial court determined that the marriage began undergoing an irreconcilable breakdown as of 2015, and that John dissipated $600,000 from the second Lambertucci Roma loan and $860,000 from the transfer of the Marlac property sale proceeds to his parents.

¶ 91             1. Dissipation of $600,000 from Second Lambertucci Roma Loans

¶ 92      As a preliminary argument, John maintains that the trial court erred in finding that he dissipated $600,000 in loan proceeds from Lambertucci Roma, because it was not disclosed in Teresa's supplemental notice of intent to claim dissipation. Rather, Teresa had claimed that John dissipated $650,000 when he conveyed funds from the sale of 5685 Wildridge to Lambertucci Roma in 2015. As such, John maintains that the trial court should not have considered the $600,000 loan to John as dissipation, as it was not properly disclosed. Teresa argues that she provided sufficient notice of her intent to claim dissipation.

¶ 93      The Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/101 *et seq.* (West 2020)) requires that a party seeking dissipation provide,

"(i) a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later;

(ii) the notice of intent to claim dissipation shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred[.]" *Id.* § 503(d)(2)(i), (ii).

Teresa argues that her supplemental notice of intent to claim dissipation was timely filed on February 7, 2020, as John did not sit for his discovery deposition until January 31, 2020. She likewise maintains that he engaged in transactions with Lambertucci Roma, and other entities Michael controlled to dissipate marital assets.

¶ 94    We agree with Teresa that there was sufficient notice regarding the dissipation of the funds from Lambertucci Roma. In the supplemental notice of dissipation, one of the enumerated acts was the "[w]rongful and malicious conveyance of $650,000.00 in 2015 plus additional sums to Lambertucci Roma, LLC[,] an entity under the control of Respondent's brother and business partner[.]" The notice essentially alleged that John had improperly dissipated the $650,000 in funds received from the sale of 5685 Wildridge to Michael. It was revealed at trial that Michael essentially returned most of those funds to John shortly thereafter in the form of the $600,000 loan from Lambertucci Roma, which John would later spend. As both the allegation and the trial court's decision ultimately relate to the same funds, notice was sufficient. See *Hamilton*, 2019 IL App (5th) 170295, ¶ 76 ("[C]laims of dissipation often remain hidden until they are uncovered during the process of discovery or even through testimony at trial.").

¶ 95    John further argues that, even were the dissipation properly disclosed, he demonstrated that the funds were used for a marital purpose, as the total cost to maintain the parties' properties in

2016 exceeded $300,000. John also disputes the trial court's finding that John "continued to live a lifestyle consistent with the best of times while Teresa relied solely as on her income from her part time waitress position." He also objects to the trial court's finding that John lived in the marital residence with a "new paramour and her child" and that he took on cruises, trips to Europe, and frequently traveled to Colorado for leisure. He argues that at the time the money was lent, the parties were still living together at 18 Wynstone and that they continued to live there for three and a half years. He maintains that he solely paid the costs associated with maintaining the parties' various properties.

¶ 96    In response Teresa argues that the trial court should have found that the breakdown of the marriage began in 2012, that John should have been found to have dissipated an additional $980,000, and that the trial court let John "off the hook" by finding that the breakdown of the marriage began in 2015. These arguments are not responsive to the question of whether the $600,000 loan to Lambertucci Roma constituted dissipation and will not be considered. Likewise, they are not supported by sufficient citations to the record.

¶ 97    Teresa also makes arguments relating to the formation and operation of 151 Group LLC and 1017 Group LLC, claiming that the evidence shows that through these organizations, John and Michael conspired to dissipate additional assets by creating false operating agreements which capped John's interest in the companies to double his initial capital contributions. Again, these arguments are not responsive to John's argument that he used the funds from the Lambertucci Roma loans to pay legitimate marital expenses. These arguments likewise are missing appropriate citations to the record on appeal. Further, the trial court found that the operating agreements for the LLCs were valid and that John's interest in those properties had been extinguished. Without a demonstration that the trial court's decision was against the manifest weight of the evidence, we

will not substitute our judgment for that of the trial court. *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 97.

¶ 98    Finally, Teresa argues that John's claims that he used the funds from Lambertucci Roma to pay for marital expenses were vague. Given the fact that she had no knowledge of the loan or the use he made of the funds, that he ceased funding their joint account, and that he did nothing to economize or preserve the marital estate, his claims should not be credited.

¶ 99    We first consider whether Teresa made a *prima facie* case for dissipation. As dissipation is premised on waste, it must have a detrimental effect on the marital estate. *Miller*, 342 Ill. App. 3d at 994. Expenses incurred to preserve or grow the value of marital assets do not constitute dissipation. However, "[w]here one spouse has sole access to funds or incurs debt without the knowledge of the other, that spouse can be held to have dissipated marital assets and can be held responsible for the entire debt." *Szesny v. Szesny*, 197 Ill. App. 3d 966, 972 (1990). "A court can find dissipation of assets where a spouse's use of marital funds for her own living expenses is so selfish, excessive, and improper as to constitute an outright waste of marital funds." *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 67. To establish a *prima facie* case, the party claiming dissipation is not required to demonstrate that the funds at issue were used for non-marital purposes, and large transfers of marital funds are generally sufficient to support a *prima facie* claim. *Hamilton*, 2019 IL App (5th) 170295, ¶ 80.

¶ 100   It is clear from the testimony of the parties throughout the trial, that while Teresa was generally aware that John was borrowing money from his family, John incurred the vast majority of the marital and institutional loans without informing or consulting Teresa. Since 2015, John unilaterally borrowed $2,825,000 from his family, causing liens to be placed on all the marital real estate. The second Lambertucci Roma loan in particular enabled Michael to place liens on

"proceeds from the sale of any other investment that John Lach has an interest in," and at the time of the marriage dissolution, Michael had placed liens on all the marital properties. As such, there was sufficient evidence to establish a *prima facie* case for dissipation, such that the burden shifted to John to establish that the funds were used for a marital purpose.

¶ 101   We do not have the parties' closing arguments, and thus do not know what arguments, if any, John raised before the trial court to combat Teresa's claim of dissipation. On appeal, John directs us to respondent's exhibit 163, which was admitted as a demonstrative exhibit and purports to be a list of the annual expenses associated with maintaining the household and the parties' various investment properties for the years 2013, 2016, and 2019. The exhibit listed $360,195 in net expenses for the year 2016. John testified that he created exhibit 163 based on financial records that were already admitted into evidence, but neither he nor the exhibit itself specified precisely what documents were used. John also directs us to portions of his testimony in which he testified that he used the $600,000 "to pay obligations that we had[,]" and that "I did this out of desperation because we had no money to pay our bills. And I did it to prevent all our properties going into foreclosure."

¶ 102   John presented these calculations for only the years 2013, 2016, and 2019, rather than present them for each year. However, accepting the numbers set forth in exhibit 163 as true, John's argument is, in essence, that he had $360,195 in net expenses for the year 2016, and even though he had no such calculations for 2015 or 2017, we should assume the expenses were similar. He continues to argue that because the two $300,000 installments were made roughly a year apart— August 5, 2015, and October 16, 2015—that "it makes sense that a year later John would need an additional $300,000.00 to cover the excess and the following year's expenses."

¶ 103   John's testimony and argument fall short of the clear and specific evidence required to rebut a claim of dissipation. The failure to explain specifically how marital funds are expended requires a finding of dissipation. *Los*, 136 Ill. App. 3d at 33 ("The petitioner testified only that he used this money for his cost of living and his bills. Again, the petitioner's failure to explain specifically how this money was spent requires a finding that he dissipated marital assets.").

¶ 104   Further, it is not enough to show merely that the spouse had expenses which exceeded the amount allegedly dissipated; a spouse charged with dissipation must also show with specificity how those funds were utilized. In *In re Marriage of Partyka*, the husband was charged with dissipating $14,000 from a commission check. 158 Ill. App. 3d 545, 551 (1987). The husband testified that he used the money to "live on and pay the bills" and "to keep the marital home going[.]" *Id.* He testified to at least $18,420 in specific expenditures. *Id.* at 552. Yet, the reviewing court found that the "failure to specify how these funds were spent results in a record reflecting that the expenditures from this $14,000 check totalled [*sic*] a minimum of $18,420. This is far from clear and specific evidence as to how respondent spent this check and required the trial court to find that respondent had dissipated its proceeds." *Id*; *cf. In re Marriage of Davis*, 215 Ill. App. 3d 763, 777 (1991) (Husband was found not to have dissipated assets where he "was meticulous about documenting his expenditures and that he accounted for every check written."). Accordingly, the trial court did not err in finding that John dissipated the $600,000 from the Lambertucci Roma loan, as John failed to show by clear and specific evidence that the funds were used for a marital purpose.

¶ 105          2. Dissipation of $860,000 in Marlac Property Sale Proceeds

¶ 106   Regarding the dissipation of the Marlac profits, John argues that he and Ron both testified credibly regarding the 2010 investment in Marlac. He maintains that the money for the investment

came from the $500,000 lent to John on November 25, 2008, for the improvements to 5315 Ravenswood, and that documents were produced to substantiate the transfer of those funds. John further argues that the trial court's determination that the 2010 agreement "was not a legitimate agreement but an attempt to secrete assets from Teresa" makes no sense in light of the facts that Teresa did not file for divorce until May 2016 and the trial court's finding that the marriage began to breakdown in 2015. John further argues that even if we were to accept the finding of dissipation, it should be reduced by $250,000 due to Ron's initial investment, and then by $100,000 for the advance from Sean Margiotta on Ron's behalf.

¶ 107   The trial court's finding of dissipation rests on a credibility finding that the purported agreement between John and his parents was illegitimate. We will not override a trial court's judgment regarding the credibility of witnesses unless that judgment is against the manifest weight of the evidence. *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶ 25. "Findings are against the manifest weight of the evidence if they are unreasonable, arbitrary, or not based on the evidence or if the opposite conclusion is clearly evident." *Id.* ¶ 30. We find that the trial court's determination that the Marlac agreement was illegitimate was against the manifest weight of the evidence.

¶ 108   The trial court maintained that the Marlac agreement was not dated, which is clearly not the case, as the agreement is dated June 3, 2010. The trial court also took issue with the fact that the agreement was handwritten and not notarized, but there is a similarly handwritten agreement in evidence, a promissory note dated January 4, 2001, for $325,000, signed by John, Teresa, Ron, and Pamela. As such, the record shows it was not abnormal for John and his parents to memorialize agreements in this manner. As further evidence of Ron and Pamela's involvement with Marlac, there is the $100,000 wire transfer from Pamela to Sean following the sale of the Marlac property.

Further, if John wanted to secrete money, it would have been simpler to say the money was used to repay one of the outstanding loans to his parents than to invent the agreement regarding Marlac, particularly as Marlac involved two other individuals, Sean and Drake.

¶ 109   As for the trial court's reasoning that John had funds of his own available to invest in Marlac, the record shows that in 2010, John had approximately $800,000 in his North Shore Community Bank & Trust account. The 2008 wire transfers show that Ron and Pamela transferred $500,000 to John. As such, only about $300,000 would have been available to John, and a $250,000 investment would have been a significant amount of his available cash. It is reasonable that John would have sought funding from his parents for the Marlac investment, as he had for past investments. Regarding Ron and John's claim that the deal was structured to incentivize a quick turnaround, at this point in time John had several costly projects which had stagnated—4611 Clark, 5315 Ravenswood, and the MLL properties—and he had several outstanding loans with his parents—the 2004 refinancing of 4611 Clark for $792,000, and the 2008 loan of $500,000 for 5315 Ravenswood. It is understandable that John's parents would wish to incentivize a quick turnaround on the Marlac project.

¶ 110   Accordingly, we reverse the trial court's finding that John dissipated $860,000 in Marlac proceeds and remand for further proceedings.

¶ 111                 D. Equitability of the Distribution of Marital Property

¶ 112   John argues that the trial court's division of the marital property was inequitable, as the trial court assigned him nearly all of the marital debts and obligations resulting in a net award of $1,632,336 in assets to Teresa and a net assignment of $4,185,260 in obligations to John. John does not challenge the distribution of the marital assets, only the marital obligations.

¶ 113 Having determined that we must remand the matter of distribution of marital property based on our reversal of the trial court's finding of dissipation, we need not reach the issue of whether the trial court's distribution of the marital property was equitable. However, there are significant deficiencies in the dissolution judgment which would have rendered review impossible regardless. Chief among these is that the trial court failed to sufficiently enumerate and valuate the marital debts and obligations.

¶ 114 The Act directs the trial court to divide marital property in "just proportions" after considering all relevant factors, including those set forth in the statute. 750 ILCS 5/503(d) (West 2020). For the purposes of the Act, marital property includes "debts and other obligations." *Id.* § 503(a)(1). In considering whether a property distribution was appropriate, our chief concern is whether the apportionment of the property was equitable. "An equitable division does not necessarily mean an equal division, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result." *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121. "A reviewing court applies the manifest weight of the evidence standard to the factual findings for each factor on which a trial court may base its property disposition, but it applies the abuse of discretion standard in reviewing the trial court's final property disposition (and how the trial court considers those factors)." *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 205 (2005).

¶ 115 In John's brief he sets forth what he claims to be the marital obligations. He claims that Teresa was allocated the PNC mortgage on 5 Lakeview, to which he does not ascribe a value. He claims he was allocated responsibility for paying the following loans:

| Institution | Principal | Balance | Secured Property | Date | Purpose |
|---|---|---|---|---|---|
| Albany Bank | $1,100,000 | ($567,025) | 5315 Ravenswood | 2002 | Purchase Money Mortgage |

| Grow Nevada | $1,100,000 | ($1,252,546) | 5315 Ravenswood | July 2, 2019 | Pay Down Albany Bank Loan |
|---|---|---|---|---|---|
| Ron & Pamela Lach | $500,000 | ($1,025,000) | 5315 Ravenswood | June 5, 2017 | Improvements to 5315 Ravenswood |
| Bank of America | ≈$750,000 | ($523,862) | 53 Knudson Ranch | 2006 | Purchase Money Mortgage |
| Ron & Pamela Lach | $380,000 | ($503,197) | 53 Knudson Ranch | August 2, 2018 | Repayment of Gelinas Loan |
| Ron & Pamela Lach | $245,000 | ($275,449) | 63 Hillburn | February 26, 2019 | Expenses |
| Bank of America[2] | | ($940,813) | 18 Wynstone | | |
| Ron & Pamela Lach | $250,000 | ($430,473) | 5 Lakeview | June 3, 2010 | Expenses |
| Ron & Pamela Lach | $792,000 | ($1,788,124) | 4611 Clark | November 12, 2004 | Refinance Mortgage |
| Lambertucci Roma | $600,000 | ($780,154) | Pahrump Properties, 4611 Clark, All Other Properties. | August 3, 2015 | Expenses |

¶ 116 The claimed balances on these loans derive from a list John compiled in support of his motion to reconsider. Neither the motion to reconsider nor John's appellant's brief contain any citations to the record to support these balance calculations.

¶ 117 The judgment for dissolution of marriage itself is silent as to the mortgages and loans from Albany Bank, Bank of America, and PNC Bank, which according to John constitute over $2 million in liabilities. The dissolution judgment does mention that "Ron claims he is currently owed a total of $2,267,000 plus interest for loans issued during the marriage[,]" but makes no effort to

---

[2]John testified that the purchase price of 18 Wynstone was approximately $1.23 million. It is unclear whether the Bank of America mortgage is the original purchase money mortgage, or what the principal balance was.

specify what the loans were for, when they were made, what assets the loans were secured by, or to quantify the amount of interest they have accrued, which according to John's brief is approximately $1.8 million. Finally, the trial court does mention the Lambertucci Roma and Grow Nevada loans from Michael Lach, but fails to account for interest, which John claims is approximately $330,000.

¶ 118 "In order to divide the marital property in just proportions, the circuit court first must establish the value of the assets." *In re Marriage of Schneider*, 214 Ill. 2d 152, 171 (2005). While a trial court is not compelled to make specific findings regarding the value of marital property, they "may be required if they are necessary to provide a basis for the trial and reviewing courts to determine the propriety of the property division[.]" *In re Marriage of Frederick*, 218 Ill. App. 3d 533, 544 (1991).

¶ 119 In the instant case, specific findings as to what loans exist, in what amounts, and what properties they encumber are necessary for us to determine the propriety of the property division in this case. Were we to attempt to evaluate the overall fairness of the allocation of marital property, we would be forced to make findings of fact as to the amount of the parties' obligations, because the trial court has left us with none to review. It is not the role of a reviewing court to independently weigh evidence and decide factual issues. *Walden v. Industrial Comm'n*, 76 Ill. 2d 193, 196 (1979).

¶ 120 As such, we remand for further findings as to the parties' marital debts and obligations.

¶ 121                                   E. Indemnification

¶ 122 John argues that the trial court lacked authority to order him to indemnify Teresa against third party claims. When a trial court lacks authority to enter an order that order is void. *People v.*

*Thon*, 319 Ill. App. 3d 855, 861 (2001). Whether a judgment is void presents a question of law we review *de novo*. *People v. Rodriguez*, 355 Ill. App. 3d 290, 293 (2005).

¶ 123   John argues there is no provision in the Act which allows for indemnification. He also argues that he could not be ordered to indemnify Teresa against future causes, because a cause of action for indemnification does not accrue until the indemnitee either has a judgment entered against them or has suffered a loss, and the Act does not allow for the division of non-existent future liabilities. Further, John argues that attorney fees may be awarded only pursuant to a motion for contribution under section 503(j) of the Act or in accordance with section 508, and to the extent the trial court's judgment awards attorney fees, it is improper. 750 ILCS 5/503(j), 508 (West 2020).

¶ 124   John's arguments are not supported by the law. Trial courts may order indemnification as part of a judgment for dissolution of marriage, as occurs anytime the trial court orders one spouse to pay a joint debt. *In re Marriage of Hopwood*, 378 Ill. App. 3d 746, 749 (2008) ("When one party is ordered to pay a joint debt in a dissolution proceeding, the party ordered to pay the debt (the indemnitor) incurs an obligation to indemnify the other party (the indemnitee) from any obligation on the debt."). The trial court may also order indemnification against future judgments. See *Diaz v. Diaz*, 83 Ill. App. 3d 341, 341 (1980) (divorce decree ordered ex-husband to pay one half of final judgment in ongoing litigation between bank and ex-wife).

¶ 125   Although indemnities in dissolution proceedings are created by judgment, they are analogous to a contract of indemnity. *Hopwood*, 378 Ill. App. 3d at 749. While a contract for indemnity does not inherently include a provision for attorney fees, an indemnity contract may include recovery of attorney fees where such terms are specifically provided. *Downs v. Rosenthal Collins Group, LLC*, 385 Ill. App. 3d 47, 49 (2008). Further, sections 503(j) and 508 address only attorney fees related to the dissolution action. Accordingly, we find that the trial court had the

authority to order John to indemnify Teresa against claims arising against the properties she was awarded.

¶ 126    John also argues that the order for indemnification goes against the policies of the Act, as it has the potential to bind John and Teresa financially for an indeterminate amount of time. John is correct that one of the goals of the Act is "to permit the parties to sever economic ties within a reasonable time period." *In re Marriage of Callaway*, 150 Ill. App. 3d 712, 717 (1986). However, the primary reason for the trial court's order of indemnification was to protect Teresa from anticipated foreclosure actions by members of John's family; actions which are only possible because John allowed his family to encumber all of the marital real estate. Accordingly, we do not find that the trial court's order of indemnification was against the policies of the Act.

¶ 127                                    F. Indirect Criminal Contempt

¶ 128    John presents two arguments regarding the denial of his petition for indirect criminal contempt. He argues that Lake County Local Rule 10-1.03 required that the trial court appoint an attorney to prosecute a claim for indirect civil contempt before it could decide whether probable cause exists. Next John argues that even a cursory review of his petition demonstrates there was probable cause to proceed to a hearing.

¶ 129    Local Rule 10-1.03 states in pertinent part that,

> "A. Petition for Adjudication. An indirect criminal contempt proceeding shall be initiated by the filing of a Petition for Adjudication of indirect criminal contempt. The Petition shall be verified and set forth with particularity the nature of the alleged conduct. The charge may be prosecuted by the State's Attorney or, if he declines, by an attorney appointed by the Court.

B. Notice of Hearing. If the Court finds that the Petition sets forth factual allegations which support a finding of contempt, it shall set the matter for hearing and order that Notice be given to Respondent alleged to have committed contempt." 19th Judicial Cir. Ct. R. 10-1.03 (eff. Oct. 24, 2016).

¶ 130   The construction of a local rule is a question of law which we review *de novo*. *VC & M, Ltd. v. Andrews*, 2013 IL 114445, ¶ 30. Where the statutory language is clear and unambiguous, it must be applied without resorting to additional tools of statutory interpretation. *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 74. We will not depart from plain statutory language by injecting provisions, exceptions, limitations, or conditions which are not found in the statute. *People v. Roberts*, 214 Ill. 2d 106, 116 (2005). Nothing in the plain language of the local rule indicates that the trial court must appoint an attorney prior to a finding of probable cause or lack thereof. To the contrary, the rule merely states that a charge "may" be prosecuted. Accordingly, the trial court's consideration of whether John's petition demonstrated probable cause without appointing counsel was not error.

¶ 131   Regarding whether the trial court erred in finding that probable cause did not exist, the entirety of John's argument is that a cursory review of his petition would demonstrate that there was probable cause. John provides no citations to authority regarding what the elements of indirect criminal contempt are, no explanation of what is required to demonstrate probable cause, and no explanation of how the allegations within his petition satisfy those requirements. "Points not argued are forfeited" and the failure to properly develop an argument with support of citations to relevant authority results in forfeiture of the argument. Ill. S.Ct. R. 341(h)(7) (eff. Oct. 1, 2020). As such, the issue is forfeited. But even were we to disregard the forfeiture, we do not believe the allegations warrant reversal.

¶ 132    Weiman's claims that he had produced all documents and subpoenas were made immediately following John's objection in court and without the opportunity to review the case file. The next day Weiman recanted his claims and admitted that his office had not produced the subpoenaed documents. Weiman explained that his clerk had failed to issue notice or send a copy to John's counsel's office.

¶ 133    Further, while the subpoena did violate Lake County Local Rule 2-2.10 subsections (B) and (E) by failing to send notice to opposing counsel and making the subpoena answerable in less than seven days; subsection G of that same rule provides that, "[i]f a party or person unreasonably refuses to comply with this Rule, or any Order entered under this Rule, the Court *may* find said person or party in contempt and punish said party or person accordingly, and *may* impose any sanction authorized by Supreme Court Rule 219." (Emphases added.) 19th Judicial Cir. Ct. R. 2-2.10(G) (eff. Oct. 24, 2016). The use of the word "may" ordinarily connotes discretion. *Krautsack v. Anderson*, 223 Ill. 2d 541, 554 (2006). As such, it was within the trial court's discretion whether to hold counsel in contempt for the failure to comply with the local rule and whether to accept counsel's explanation for such fairness.

¶ 134    As for John's Illinois Banking Act (205 ILCS 5/1 *et seq.* (West 2020)) claim, the Banking Act requires that before disclosing customer records pursuant to a subpoena, the bank must send a copy of the subpoena to the customer. *Id.* § 48.1(d). It is a business offense to willfully induce or attempt to induce an officer or employee of a bank to disclose financial records in violation of section 48 of the Banking Act. *Id.* § 48.1(e).

¶ 135    While Weiman's subpoena violated the local rule, and the letter clearly misrepresented the situation regarding the prior subpoena, the trial court could reasonably have found that he did not knowingly and willfully induce or attempt to induce an officer or employee of Well Fargo to

disclose the financial records without Ron and Pamela receiving notice of the subpoena. While the subpoena did have a short turn around time, the bank could have mailed or emailed a copy of the subpoena to Ron and Pamela prior to complying with the subpoena. Further, it appears that Weiman's aim was to receive the documents prior to the commencement of trial, not to avoid notice to Ron and Pamela, as supported by the fact that there is nothing in the first subpoena which suggests that Weiman was attempting to avoid notice to Ron and Pamela.

¶ 136    Finally, regarding the failure to turn over a copy of the second subpoena, we note that, while the trial court stated on February 18, 2020, that Weiman was to turn over the Wells Fargo documents and subpoenas, on February 19, 2020, the court ordered Weiman to turn over only the documents. Further, the February 18, 2020, statement was made within the context of introducing the exhibit into the record and may have reflected what the trial court was requiring before it would allow use of the exhibit, rather than a direct order to produce the document. This interpretation is somewhat bolstered by the trial court's mention of its "recollection of events" as one of its bases for denying the petition.[3]

¶ 137    Regardless, "[a] court has the inherent power to punish, as contempt, conduct that is calculated to impede, embarrass, or obstruct the court in its administration of justice or derogate from the court's authority or dignity, or to bring the administration of the law into disrepute." *People v. Ernest*, 141 Ill. 2d 412, 421 (1990). The exercise of contempt "is a delicate one, and care is needed to avoid arbitrary or oppressive conclusions." *Cooke v. United States*, 267 U.S. 517, 539

---

[3]Taken together, Weiman's failures in this regard are certainly cause for concern. Abuse of the discovery process should not be taken lightly. See *In re Marriage of Bernstein*, 2023 IL App (2d) 210623-U, ¶¶ 20-23, 27, 30-31, 37-39, 77-90.

(1925). Whether Weiman's failure to produce the second subpoena violated the trial court's order, it was within the discretion of the trial court whether to exercise its contempt powers or refrain from doing so.

¶ 138   Accordingly, we affirm the trial court's dismissal of John's petition for adjudication of indirect civil contempt.

¶ 139                            III. CONCLUSION

¶ 140   For the reasons stated, we affirm the trial court's valuation of the MLL properties, affirm the finding of dissipation regarding the $600,000 loan from Lambertucci Roma, reverse the finding of dissipation regarding the $860,000 Marlac proceeds, affirm the dismissal of John's petition for adjudication of indirect criminal contempt, and remand for further proceedings. On remand the trial court shall make specific findings as to what particular marital debts and obligations exist and in what amounts. The trial court shall then determine whether, in light of its new findings regarding the value of the marital obligations and our reversal of its finding of dissipation in the amount of $860,000, its dissolution order is still appropriate or whether the entry of a new dissolution order is necessary. In either case, the trial court shall also enter an order addressing the refinancing of the PNC mortgage on 5 Lakeview, assuming the issue is not moot.

¶ 141   Affirmed in part and reversed in part; remanded with directions.

¶ 142   JUSTICE HUTCHINSON, concurring in part, and dissenting in part:

¶ 143   I concur with the majority's analysis on all but one point. Specifically, I disagree with the majority's affirmance of the finding on John's dissipation concerning the $600,000 from the second Lambertucci Roma loan. See *supra* ¶¶ 91-104. "[D]issipation is founded on objective factors" such as "whether the alleged dissipation occurred while the marriage was undergoing a breakdown, whether the relevant expenditure or conduct was undertaken for a purpose unrelated

to the marriage, and whether the expenditure or conduct benefited only the spouse charged with dissipation." *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147, ¶ 40 (citing *In re Marriage of O'Neill*, 138 Ill. 2d 487, 497 (1990)). In my view, both the trial court and the majority have mischaracterized the key evidence and the arguments on this issue. As a necessary background to understanding the property to which dissipation can be applied, the only non-marital property was John's condominium in Wauconda; the rest of the property distributed in the proceedings was part of the marital estate. And, in 2016, the parties continued to reside in the marital home in North Barrington, and the undisputed evidence showed that the parties used roughly $360,000 in 2016 to pay the notes, taxes, insurance, and assessments on the marital properties—some of which were eventually awarded to Teresa as part of the marital property distribution.

¶ 144    In addition, on the subject of the marital home and dissipation, the trial court found dissipation in part because, "[u]ltimately, John would live in the former marital residence with a new paramour and her child ***." The word "ultimately" in that sentence distorts the issue. From her own testimony, Teresa lived in the marital home until January 2019, and the record does not show any sort of unconventional three-party arrangement with John's paramour existed prior to Teresa's departure. That Teresa did not know the ins and outs of any expenditures involving the marital properties appears typical of the parties' chosen financial arrangement. But, barring a Marvel-esque fracture of the space-time continuum, I know of no way in which the parties' joint payment of marital expenses could be viewed as dissipation for John's exclusive benefit three years after those funds were allegedly spent.

¶ 145    To be clear, there are aspects of this entire case that absolutely strain credulity, much of which arises from the incomplete picture of the parties' finances. Further, as the majority notes, the submission of written closing arguments, particularly in a case of this financial complexity, is

practically required for a complete understanding and review of the record. *Supra* ¶ 74. It is simply incomprehensible to me that neither party ensured that their written closing arguments were part of the record when both parties are appealing.

¶ 146   Moreover, as the majority recounts, the record in this case is literally thousands of pages of transcripts and exhibits that neither party has organized or explained in their briefs. It is of course not our obligation to scour the record and search for evidence that the parties have neglected to present in a cogent manner. See *Lazy "L" Family Preservation Trust v. First State Bank of Princeton*, 167 Ill. App. 3d 624, 627 (1988). My concern here, however, is that amidst this backdrop, there are details of the parties' finances that were clearly presented; the trial court simply overlooked them. That was an abuse of discretion. I can sympathize with the trial court, perhaps, having felt overwhelmed or frustrated with the parties' presentation of this evidence. But what I cannot do is simply endorse the trial court's approach to a blanket finding of dissipation, let alone agree that Teresa's *prima facie* case for dissipation, which rested largely on her own lack of awareness of the parties' finances during the course of their marriage, was not overcome, at least in part, by the evidence John presented.

¶ 147   In my research, I can find no case quite like this one. In *Schneeweis*, for example, the husband spent funds foolishly because he had no experience as a day trader and recklessly gambled away all of his family's assets. 2016 IL App (2d) 140147, ¶ 43. Here, the trial court credited John's testimony as an experienced expert when it came to land valuations and real estate transactions. John offered substantial, detailed evidence regarding the costs of maintaining the parties' marital properties in 2016 and he argues that those expenses needed to be maintained, and were maintained for purposes of distribution. That argument was not unreasonable, especially in light of the real estate and loan transactions that occurred during the course of the marriage.

¶ 148   I would note too, that unlike other cases in which "loans" were granted to the parties by family members, the evidence showed that most of the loans made to John during the marriage were in fact repaid. *Cf. In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 54; *In re Marriage of Blazis*, 261 Ill. App. 3d 855, 868 (1994). These loans were made to John so that he could develop various marital properties, which generated the family's income and livelihood during the marriage.

¶ 149   While I am concerned about the allocation of approximately 96% of the marital debt to John, he did receive the lion's share of the income-generating property. Once again, a better organization and presentation of the evidence, rather than just providing hundreds of pages of bank records and handwritten notes on expenditures, would have helped the trial court and this court make a more meaningful distribution of the martial debt. "[C]ourts are not depositories where litigants may dump the burden of argument and research ***." *In re Marriage of Hundley*, 2019 IL App (4th) 180380, ¶ 82.

¶ 150   Finally, as noted, dissipation involves expenditures or conduct undertaken for a purpose unrelated to the marriage (*Schneeweis*, 2016 IL App (2d) 140147, ¶ 39) and the properties maintained by John's expenditures from any and all sources kept the loans and mortgages current at least until the trial started. The only non-marital property identified during the trial was one of the condominiums in Wauconda, and all properties distributed to the parties were classified as marital. Therefore, the obvious question is how could John have dissipated marital assets to maintain marital assets and still be burdened with 96% of the debt left on those marital assets? Based upon the presentation of the evidence the first time this case was before the trial court, I am not optimistic that the remand the majority has ordered will be successful. But, as they say, hope springs eternal.

¶ 151   For these reasons, I dissent in part.